[Cite as *State v. Duhamel*, 2015-Ohio-3145.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 102346

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JASON DUHAMEL

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-568965-A

**BEFORE:** E.T. Gallagher, J., Jones, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** August 6, 2015

**ATTORNEY FOR APPELLANT**

Dean M. Boland
Boland Legal, L.L.C.
1475 Warren Road
Unit 770724
Lakewood, Ohio 44107


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Brett Kyker
         Holly Welsh
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Jason Duhamel ("Duhamel"), appeals the denial of a motion to suppress as well as his convictions and sentence. He assigns the following errors for our review:

1. The court erred in denying Duhamel's motion to suppress the statement extracted from him while in custody but in the absence of *Miranda* warnings.

2. The court erred in denying Duhamel's Rule 29 motion.

3. The trial court erred in denying Duhamel additional funds for his computer forensics expert.

4. The jury's verdict was against the manifest weight of the evidence.

5. The state's evidence was insufficient to support a verdict of guilty on Counts 1-36 in the indictment.

6. The sentence in this matter was a violation of Duhamel's Eighth Amendment protection against cruel and unusual punishment.

7. The imposition of costs and fines on Defendant-appellant was unconstitutional.

{¶2} We find no merit the appeal and affirm.

## I. Facts and Procedural History

{¶3} Duhamel was charged with 37 sex-related offenses. Counts 1 through 35 of the indictment, charged Duhamel with pandering sexually oriented matter involving a minor in violation of R.C. 2907.322(A)(2) and 2907.322(A)(1). Counts 36 and 37 charged Duhamel with one count each of illegal use of minor in nudity-oriented material,

in violation of R.C. 2907.323(A)(1), and possession of criminal tools, in violation of R.C. 2923.24(A). The charges resulted from a search of Duhamel's home in which investigators found digital files of child pornographic videos on his computer.

{¶4} In preparation for trial, Duhamel filed a motion requesting funds to retain an expert computer examiner, and the court awarded him $2,500. A few months later, Duhamel filed another motion requesting additional funds for his expert, and the court awarded him another $1,000. Duhamel later filed a third motion requesting more money for the expert but, this time, the trial court denied the motion.

{¶5} Duhamel also filed a motion to suppress evidence of any statements he made to police during the search of his home. At a hearing on the motion, Investigator David Frattare ("Frattare") of the Cuyahoga County Prosecutor's Office and the Ohio Internet Crimes Against Children ("ICAC") Task Force, testified about his investigation that led to the search. Specifically, he identified an IP address suspected of sharing 66 files of child pornography via the Ares peer-to-peer file sharing network. An IP address is a string of numbers associated with the internet connection of a particular service provider. (Tr. 44.) Frattare described it as the "street address for your internet service." (Tr. 307.)

{¶6} File sharing networks allow program users to share files on their personal computers with other program users. (Tr. 297-299.) The IP address Frattare identified in this case was linked to a computer located in a residence on West 126th Street in Cleveland, Ohio. Investigators connected directly to the suspect's computer and browsed numerous files with titles such as "Alicia 10 yo pthc little girl loves adult sex,"

"10 yr boy with 12 yr girl bufing," and "Johanna 9 yr swallows cum." Investigators downloaded two of the files, and confirmed that they both contained child pornography.

{¶7} Further investigation revealed that three adults lived in the house associated with the IP address, but investigators did not know which of the adults was pandering the pornography. Pursuant to a search warrant, 13 investigators searched Duhamel's house early one morning. Duhamel was the only adult in the home at the time of the search.

{¶8} Detective Jamie Bonnette ("Bonnette"), of the Cuyahoga County Sheriff's Office, interviewed Duhamel while other officers searched the house. A video recording of the interview, which occurred at the dining room table, was played for the court and made part of the record. Bonnette testified that before he posed any questions, he advised Duhamel that he was not under arrest and that he was not required to answer any questions if he did not want to. Throughout the interview, Bonnette reminded Duhamel that he was not required to answer any questions. Yet, Duhamel spoke freely with police and, at times, initiated conversation.

{¶9} After hearing the testimony and reviewing the video of the interview, the trial court determined that because Duhamel was not in custody when he made statements to police, *Miranda* warnings were not required. Accordingly, the court denied the motion to suppress.

{¶10} The evidence presented at the suppression hearing was reintroduced for the jury at trial. In addition, Frattare explained how individuals search for and download files and described several popular search terms used to find child pornography. For

example, the search term "PTHC" stands for "preteen hard-core," and "9" combined with the letters "yo" indicates "nine years old." According to Frattare, child pornography files generally contain descriptive titles and many titles expressly indicate that they contain child pornography. (Tr. 429.)

{¶11} Duhamel admitted to Bonnette that he had files that he knew were illegal. (Tr. 425.) Duhamel also told police that he had learned about the search term "raygold" from a former coworker at Toys "R" Us, but stopped using it after three searches led to inappropriate material involving nine-year-old girls. Duhamel denied using the search terms "PTHC" or "pedo," but knew that "pedo" was associated with child pornography.

{¶12} Duhamel told police that whenever he downloaded files from Ares, he downloaded multiple files at once, transferred the downloaded files to folders on an external hard drive, and sorted through them later. He denied looking at the downloaded files before transferring them to the external hard drive. However, he advised Bonnette that any questionable material on his devices would likely be found in either a folder titled "finished" that was within a folder titled "other" on the external hard drive, or within a folder titled "kid" or "young" that was within a folder called "movies." Duhamel told investigators that he generally did not keep downloaded files on his computer.

{¶13} Investigator Jason Howell ("Howell"), of the Cuyahoga County Prosecutor's Office and the Ohio ICAC Task Force, testified that he performed on-scene forensic scans of numerous digital devices in Duhamel's home during the search in order to

confiscate only those devices that contained child pornography.  Investigators seized six items from the residence: an HP USB drive, a Seagate external hard drive, a Toshiba external hard drive, a Western Digital external hard drive, a Dell notebook computer, and an Antech external hard drive.  All of these items were found in Duhamel's bedroom.  Howell bookmarked the files of child pornography on the devices wherever they were found.

{¶14}  Howell created a PowerPoint presentation containing the files he bookmarked during his on-scene forensic examinations.  Each slide of the presentation corresponded to a separate count of the indictment and included the file, title, date the file was created, and file pathway.  A DVD containing the presentation was admitted into evidence.  As relevant to this appeal, the list of titles for each count in the Power Point presentation was as follows:

Count 3 "-(sdpa) alicia 10 yo pthc little girl loves adult sex(2)(2)(2).avi"
Count 4 "-(sdpa) mom - old sister and little kid – family sex
    pthc.mgp"
Count 5 "!!!!! hot hot hot !!!! - 13y bondage.avi"
Count 6 "(pthc) notta 9 yo girl & men.mpg"
Count  7 "pthc-real dad & toddler daughter sex.wmx"
Count 8 "tara 007 pthc jan 07 masterbation and penetration(2).mpg"
Count 9 "delic video (4).wmv"
Count 10 "! new ! (pthc) veronika nuevo 2 (11 yo) nenas-all(2).mpg"
Count 11 "! new pthc dark studio fully.avi"
    Count 12 "((hussyfan)) pthc-colombia-girl-sexo infantil-desvergacion!avi"
Count 13 "(pthc)(japanese loli) kikuko 10 y 12.avi"
Count 14 "(pthc) boy mom 5.mpg"
Count 15 "(pthc) brazil – 10 yr boy with 12 yr girl bufing
    04-01-2005.mpg"
Count 16 "(pthc) johanna 9 yr. swallows cum" slct.avi"
Count 17 "(pthc) asian_loli.avi"
Count 18 "(ptsc)-(unverified) 0 23 27.mpg"

Count 19 "-(sdpa) alicia 10 yo pthc little girl loves adult sex(2)(2)(2).avi"[1]

Count 20 "-(sdpa) mom - old sister and little kid – family sex pthc.mgp"

Count 21 "10 years old forced sex(2).mpg"

Count 22 "8 yr orgasm and anal fuck hard! new! (Pthc) 2007 new girl img 0004(2).wmv"

Count 23 "pthc – 7 yr lesbian twin sisters"

Count 24 "pthc – open – euro family young sex education for very young girl.mpg"

Count 25 "ptsc bella!!- (webcam) - 11 yo-girly avi - moscow-mafia-pthc-hussyfan-webcam-2006.avi"

Count 26 "07 taboo – father and his daughter 9 y old.mpg"

Count 27 "2009 webcam pt – xxcaliaxx2.avi"

Count 28 "! ! ! new ! ! ! (pthc) linda - a little extra 217 avi - - (spda) linda - 10 anos mamando y tomando semen.avi"

Count 29 "air.mpg"

Count 30 "kley_full.mpg"

Count 31 "$R26XWOW4.avi"

Count 32 "$R6ZG1QL.mpg"

Count 33 "$RIWVQPI.avi"

Count 34 "$R1D03L4.mpg"

Count 35 "$RXC7H3I.wmv"

Count 36 "lolicon hentai girl nude.avi"

{¶15} Howell testified that Counts 5 through 8 and 10 through 26 were found in the folder titled "kid" that was within the folder titled "movies," on the Western Digital external hard drive. Counts 9 through 27 were found in a folder titled "sex folder" that was also located in the "movies" folder on the Western Digital external hard drive. Counts 28 through 30 and 36 were found in another folder titled "kid" that was within a folder titled "new folder" on the Western Digital external drive. The files represented in

---

[1] This count involves the same video as the video in Count 3, but it was downloaded to two different devices.

Counts 31 through 35 were found in the Windows recycle bin of the Dell notebook computer.

{¶16} After the search, Howell conducted a more thorough forensic investigation of the devices in a lab, where he discovered 20 more files of child pornography in addition to comics and animated videos of children having sex. Howell testified that he bookmarked 19 "thumbnails" of child pornography. He explained that a "thumbnail" is "a still frame of, or an image of one frame of the video," and that Duhamel must have created the thumbnails by playing the video files on the computer. Howell described the organization of the folders on Duhamel's devices and stated that the file folders were named "incest," "lolicon bondage," "rape," "sex," "furry," "hentai," "hottails," "JAB comic big collection," "mom," and "naruto." Each folder contained additional folders that corresponded to the name of the larger folder. For example, a folder titled "cartoon," contained animation, and the files found in the "kid" folder had titles indicative of child pornography.

{¶17} Duhamel moved for acquittal pursuant to Crim.R. 29 after the state rested its case. The court denied the motion and the case was submitted to the jury. The jury found Duhamel guilty on Counts 3 through 8, 10 through 30, 36, and 37, and not guilty of Counts 1, 2, 9, and 31 through 35. The court sentenced Duhamel to three years in prison on Counts 3 and 4, to be served concurrently; four years in prison on Counts 5 through 8, 10 through 30, and 36, to be served concurrently; and one year in prison on Count 37. However, the court ordered that the three-year sentence on Counts 3 and 4, the four-year

sentence on Counts 5 through 8 and 10 through 27, the four-year sentence on Counts 28 and 29, and the four-year sentence on Counts 36 and 37, were to be served consecutively for an aggregate 15-year prison term. This appeal followed.

## II. Law and Analysis

### A. Motion to Suppress

{¶18} In his first assignment of error, Duhamel argues the trial court erred in denying his motion to suppress evidence of statements he made to police when they executed the search warrant of his home. He contends the police should have given him *Miranda* warnings before questioning him because, although he was not under arrest, he was, for all intents and purposes, in police custody.

{¶19} Appellate review of a motion to suppress involves a mixed question of law and fact. "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Accepting the facts as true, the reviewing court must then independently determine as a matter of law, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard. *Id.*

{¶20} The Fifth Amendment to the U.S. Constitution provides that an individual shall not "be compelled in any criminal case to be a witness against himself." In

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court applied the Fifth Amendment right against self-incrimination to police interrogations of individuals in custody, and held:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom * * * in any significant way and is subjected to questioning, * * * [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. * * * [U]nless and until such warnings * * * are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Id*. at 478-479.

{¶21} *Miranda* warnings are only required when the accused is subjected to custodial interrogation. *Id*.; *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). In determining whether police questioning constitutes "custodial interrogation" for *Miranda* purposes, the inquiry is whether a reasonable person would feel free to leave the interview under the totality of the circumstances presented at that time. *Biros* at *id*.

{¶22} However, the determination of what constitutes "custody" does not depend on the subjective feelings of the accused or the subjective, unarticulated goals of police. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *State v. Hopfer*, 112 Ohio App.3d 521, 545-546, 679 N.E.2d 321 (8th Dist.1996). The focus is on the perception a reasonable person would have under the circumstances. *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Indeed, "[t]he ultimate inquiry is whether there is a 'formal arrest or restraint on freedom of movement'

of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). *See also State v. Barnes*, 25 Ohio St.3d 203, 207, 495 N.E.2d 922 (1986).

{¶23} Duhamel argues that a reasonable person in his position would have believed his liberty was restrained to the same extent as a formal arrest because police entered his home with guns drawn and prohibited him from calling his mother and from going to his bedroom to retrieve a cough drop. However, Bonnette testified that prior to posing any questions, he informed Duhamel that he was not under arrest. Bonnette also testified, and the video of the interview shows, that Bonnette reminded Duhamel several times that he did not have to answer any questions if he did not want to.

{¶24} Moreover, there was nothing accusatorial about the interview. There were no threats, nor were the police overbearing. The video of the interview shows that the tenor of the conversation was nonthreatening. Duhamel was never handcuffed and police spoke in a casual manner. Duhamel did not appear overly nervous and initiated the conversation at times. *Miranda* does not affect the admissibility of "volunteered statements of any kind." *Miranda* at 478.

{¶25} Although the officers refused to allow Duhamel to go to his bedroom to get a cough drop, 13 police officers were searching the house at the time. Under these circumstances, a reasonable person would conclude that while he was not under arrest, he could not go to the bedroom because his presence would interfere with police business. Bonnette testified they refused to permit Duhamel to go to his bedroom because they

thought he might try to hide something they were looking for. The police were also concerned for everyone's safety.

**{¶26}** Because Duhamel was not subject to custodial interrogation and his statements to police were voluntary, the officers were not required to give Duhamel *Miranda* warnings before speaking with him during the search of his home.

**{¶27}** The first assignment of error is overruled.

### B. Sufficiency and Manifest Weight of the Evidence

**{¶28}** In the second and fifth assigned errors, Duhamel argues his convictions are not sustained by sufficient evidence. In the fourth assignment of error, Duhamel argues his convictions are against the manifest weight of the evidence because there was no evidence that Duhamel had "knowledge of the character of the material or performance involved" in any of the downloaded files listed in the indictment.

**{¶29}** Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together because they are closely related, while applying the distinct standards of review to Duhamel's arguments. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶30}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶31}** In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins* at 387. While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id*. The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

**{¶32}** Duhamel was charged with pandering sexually oriented material involving a minor, in violation of R.C. 2907.322(A)(1), and illegal use of a minor, in violation of R.C. 2907.323(A)(1). R.C. 2907.322 provides, in relevant part:

(A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:

(1) Create, record, photograph, film, develop, reproduce, or publish any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality;

R.C. 2907.323(A)(1) provides that no person shall "create * * * or transfer any material or performance that shows the minor in a state of nudity."

**{¶33}** Duhamel argues there was no evidence that he knew any of the 36 files referenced in the indictment contained child pornography. In support of his argument, he cites the testimony of Detectives Frattare and Howell, who stated that an Ares user cannot determine the contents of a file with certainty before downloading it because files cannot be opened until after they have been downloaded.

**{¶34}** Howell admitted on cross-examination that Duhamel's files, alone, do not contain reliable evidence of dates and times on which the files were opened or that they were ever opened by Duhamel's family computer or its Windows 7 operating system. (Tr. 584.) Howell further admitted that file names do not necessarily represent the contents of a file accurately. When asked if he would be comfortable testifying under oath that he "knows the character of the material or performance in the file just by looking at the file name," he replied: "No, not by the file name." Therefore, Duhamel argues, it was impossible for him to have had knowledge of the character of the material or performance of any of his files until after the act of pandering was committed by downloading the files.

**{¶35}** However, circumstantial evidence belies Duhamel's claimed ignorance. In the video of the search of Duhamel's home, Duhamel is seen explaining to police where child pornography may be found. Duhamel also admitted he was familiar with certain search terms that locate child pornographic files. He explained that the search term

"pthc" refers to "preteen hardcore," and that "raygold" refers to pornographic material involving nine-year old girls. The video shows that Duhamel had both knowledge and experience locating child pornography.

{¶36} R.C. 2901.22(B) defines "knowledge," and states, in relevant part, that

> [a] person has knowledge of circumstances when the person is aware that such *circumstances probably exist*. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a *high probability of its existence* and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

(Emphasis added.) Thus, to have knowledge, a person need only believe that certain circumstances probably exist, not that they exist with 100% certainty. Howell testified that child pornographic files generally have descriptive titles, such as "-(sdpa) alicia 10 yo pthc little girl loves adult sex(2)(2)(2).avi," and sometimes include icon-type pictures illustrating the subject of the files. (Tr. 449.) A person viewing the files sees the titles and images before he downloads them.

{¶37} The jury returned guilty findings only on those counts where the file had a descriptive title that described the file's contents and acquitted him of all counts related to files with non-descriptive titles. The jury's findings comport with the statutory definition of "knowledge" because the file titles indicated they likely contained child pornographic material. They also included specific search terms with which Duhamel was familiar.

{¶38} Further, the jury found that Duhamel possessed at least 28 files of child pornographic material. Possession of such a large number of downloaded child

pornography files cannot be a coincidence, especially since most of the files had titles indicative of child pornography. Duhamel transferred the files to external hard drives and saved them in separate folders that he categorized and named according to the type of files contained therein. Many of the same files were saved on more than one hard drive. The fact that Duhamel categorized a large number of pornographic files into separate folders further demonstrates his knowledge of the material.

{¶39} Moreover, Duhamel confessed to police during the execution of the search warrant that he possessed illegal files. This confession shows he had knowledge of the contents of his files. (Tr. 425.) Therefore, there was sufficient evidence that Duhamel knew he was downloading child pornographic material when he downloaded the files, and Duhamel's convictions were not against the manifest weight of the evidence, and the evidence was sufficient to support them.

{¶40} Accordingly, the second, fourth, and fifth assignments of error are overruled.

### C. Additional Funds for Expert

{¶41} In the third assignment of error, Duhamel argues the trial court erred in denying his third request for funds to pay his expert witness.

{¶42} We review the trial court's denial of a motion for funds to obtain an expert witness for an abuse of discretion. *State v. Mason*, 82 Ohio St.3d 144, 150, 694 N.E.2d 932 (1998). An abuse of discretion connotes that the trial court's attitude was

unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶43} In *Mason*, the Ohio Supreme Court held that

> due process * * * requires that an *indigent* criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial.

*Mason* at 150. (Emphasis added.) Thus, according to *Mason*, only *indigent* criminal defendants are entitled to state funds to retain an expert, and only if certain conditions are met.

{¶44} The trial court did not find Duhamel indigent, and no affidavit of indigency was filed at the time the court denied Duhamel's third request for additional funds to pay his expert. Without a finding of indigency, Duhamel was not entitled to any state funds. *Id., see also State v. Wagner*, 5th Dist. Licking No. 03 CA 82, 2004-Ohio-3941, ¶ 28.

{¶45} Furthermore, the trial court awarded Duhamel $3,500 for an expert even though he was not indigent. Duhamel has not demonstrated that the court's denial of additional funds deprived him of a fair trial. Therefore, we cannot say that the trial court abused its discretion when it denied Duhamel's request for more funds.

{¶46} The third assignment of error is overruled.

### D. Cruel and Unusual Punishment

{¶47} In the sixth assignment of error, Duhamel argues the consecutive sentence he received violates his Eighth Amendment protection against cruel and unusual punishment.

{¶48} R.C. 2953.08(G)(2) provides that an appellate court may reverse, vacate, or modify a consecutive sentence if (1) the sentence is "otherwise contrary to law" or (2) the appellate court, upon its review, clearly and convincingly finds that the record does not support the sentencing court's findings under R.C. 2929.14(C)(4). Obviously, an unconstitutional sentence is contrary to law.

{¶49} The Eighth Amendment's prohibition on "cruel and unusual punishments" requires that the punishment for a crime be proportionate to the offense. *Weems v. U.S.*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). "'[C]ases in which cruel and unusual punishments have been found are limited to those involving sanctions which under the circumstances would be considered shocking to any reasonable person.'" *State v. Weitbrecht*, 86 Ohio St.3d 368, 371, 715 N.E.2d 167 (1999), quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964). "'[A]s a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment.'" *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 21, quoting *McDougle*.

{¶50} Duhamel does not argue that any of his individual sentences exceed the statutory range for his convictions. He argues his sentence is cruel and unusual because

the trial court erroneously ordered consecutive prison terms and failed to merge allied offenses.

### 1. Consecutive Sentences

**{¶51}** There is a presumption in Ohio that prison sentences should be served concurrently, unless the trial court makes the findings outlined in R.C. 2929.14(C)(4) to justify the imposition of consecutive sentences. R.C. 2929.41(A). R.C. 2929.14(C)(4) requires the court to find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) at least one of the three findings set forth in R.C. 2929.14(C)(4)(a)-(c) applies. As relevant here, R.C. 2929.14(C)(4)(b) provides as a finding that the court consider whether

> at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

**{¶52}** In *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29, the Ohio Supreme Court held that

> a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld.

The failure to make the findings, however, is "contrary to law." *Id*. at ¶ 37.

{¶53} At the sentencing hearing, the trial court expressly found that "a prison sentence is consistent with the rules and principles" of sentencing. In imposing the consecutive sentences, the trial court stated, in relevant part:

> I believe consecutive sentences are necessary to protect the public from future crimes and to punish you. They're not disproportionate to the seriousness of [your] conduct and danger you pose.
>
> I do find that this was part of a course of conduct inasmuch as, again, as I indicated, happened on June 10th, June 24th, June 25th, June 29th, July 1st. So, I feel that these are appropriate, necessary sentences.

(Tr. 859.) Thus, the trial court made all the findings necessary for the imposition of consecutive sentences.

{¶54} Furthermore, the record supports the court's findings. In *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), the U.S. Supreme Court recognized the government's interest in safeguarding the physical and psychological well-being of children and in preventing their sexual exploitation. *Id.* at 756-757. Every video or image of child pornography on the internet constitutes a permanent record of that particular child's sexual abuse. The harm caused by these videos is exacerbated by their circulation. *Id.* The videos in Duhamel's library show eight, nine, and ten-year old girls being vaginally raped by adult men. Adult men are seen video-recording and photographing young girls while they are being molested, raped, and abused.

{¶55} These videos are far worse than solitary photographs of naked children, which are themselves harmful to the child victims. Duhamel downloaded the videos at

different times as part of a course of conduct. Therefore, the record supports the court's finding that consecutive sentences are proportionate to the seriousness of Duhamel's crimes, are necessary to punish Duhamel for his multiple downloads of child pornographic material, and to protect the public.

## 2. Allied Offenses

{¶56} Duhamel argues his sentence is cruel and unusual because the trial court erred in failing to merge allied offenses of similar import.

{¶57} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 23. Under R.C. 2941.25(A), when the same conduct by the defendant "can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However, R.C. 2941.25(B) provides

> Where the defendant's conduct constitutes two or more offenses of
> dissimilar import, or where his conduct results in two or more offenses of
> the same or similar kind committed separately or with a separate animus as
> to each, the indictment or information may contain counts for all such
> offenses, and the defendant may be convicted of all of them.

**{¶58}** The Ohio Supreme Court recently clarified the test courts should employ when deciding whether two or more offenses are allied offenses that merge into a single conviction under R.C. 2941.25 in *State v. Ruff*, Slip Opinion No. 2015-Ohio-995, ¶ 25. In *Ruff*, the court stated that its decision in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, which directed courts to focus on the defendant's conduct when evaluating whether offenses are allied, was "incomplete." *Id*. at ¶ 16.

**{¶59}** In accordance with *Johnson*, the *Ruff* court maintained that when determining whether there are allied offenses that merge into a single conviction, the court must first examine the defendant's conduct. *Ruff* at ¶ 25. The court further held that multiple offenses do not merge if (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation. *Id*. at syllabus. With respect to the first factor, the court explained that two or more offenses are dissimilar within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id*. at syllabus.

**{¶60}** This court has previously held that "multiple convictions are allowed for each individual image because a separate animus exists every time a separate image or file is downloaded and saved." *State v. Mannarino*, 8th Dist. Cuyahoga No. 98727, 2013-Ohio-1795, ¶ 53. Although the defendant may have obtained images around the same time, the acquisition of each file constitutes a new and distinct crime because the

"mere fact that the crimes occurred in quick succession does not mean that they were not committed separately or with separate animus." *State v. Eal*, 10th Dist. Franklin No. 11AP-460, 2012-Ohio-1373, ¶ 93. The selection of each individual video or image is a separate decision.

{¶61} Moreover, the children depicted in the images or videos are the victims of pandering sexually oriented material involving a minor offenses. *State v. Meadows*, 28 Ohio St.3d 43, 49, 503 N.E.2d 697 (1986). Each video presents a different child or group of children. Individuals who view or circulate child pornography harm the child in several ways (1) by perpetuating the abuse initiated by the creator of the material, (2) by invading the child's privacy, and (3) by providing an economic motive for producers of child pornography. *U.S. v. Norris*, 159 F.3d 926 (5th Cir.1998). As previously stated, the dissemination of child pornography exacerbates and continues the exploitation and victimization of the individual child. *Ferber*, 458 U.S. 747 at 759, 102 S.Ct. 3348, 73 L.Ed.2d 1113; *See also U.S. v. Sherman*, 268 F.3d 539, 545 (7th Cir.2001) (even a "passive consumer who merely receives or possesses the images directly contributes to this continuing victimization.").

{¶62} Therefore, Duhamel's convictions were not allied offenses of similar import because he downloaded each file of child pornography with a separate animus, and each downloaded file was a crime against a separate victim or victims.

{¶63} Duhamel's sentence is not cruel or unusual. The sentence falls within the statutory range, the trial court made all the required statutory findings for the imposition

of consecutive sentences, and none of Duhamel's convictions were allied offenses of similar import.

{¶64} Accordingly, the sixth assignment of error is overruled.

### E. Costs and Fines

{¶65} In the seventh assignment of error, Duhamel argues the trial court's imposition of fines and court costs was unconstitutional because he is indigent. He contends the collection methods used by the Ohio Department of Rehabilitation and Correction violate his constitutional right to Equal Protection.

{¶66} The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Ohio's Equal Protection Clause, Article I, Section 2 of the Ohio Constitution, similarly states that "[a]ll political power is inherent in the people. Government is instituted for their equal protection and benefit."

{¶67} Thus, the guaranty of equal protection prevents the government from treating people differently under its laws on an arbitrary basis. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 681, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (Harlan, J., dissenting). The equal protection provisions of the Ohio and U.S. Constitutions are functionally equivalent and are subject to the same analysis. *State v. Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, ¶ 11, citing *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 59, 717 N.E.2d 286 (1999).

{¶68} Courts apply varying levels of scrutiny to equal protection claims depending on the rights at issue and the alleged discriminatory classifications created by the law. *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N.E.2d 944, ¶ 18. Statutes involving fundamental rights, or that make classifications based upon a suspect class, are subject to strict scrutiny. *Thompson* at ¶ 13. Suspect classes have traditionally been defined as classifications based on race, sex, religion, and national origin. *Adamsky v. Buckeye Local School Dist.*, 73 Ohio St.3d 360, 362, 653 N.E.2d 212 (1995). Recognized fundamental rights include the right to vote, the right of interstate travel, rights guaranteed by the First Amendment to the U.S. Constitution, the right to procreate, and other rights of a uniquely personal nature. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed. 2d 520 (1976).

{¶69} In this case, Duhamel challenges his classification as an indigent prisoner. Indigent prisoners do not belong to any traditionally defined suspect class. Further, Duhamel does not argue that the collection of court costs and fines from his prison account violates a fundamental right. Where a statute or regulation involves neither a suspect class nor a fundamental right, it comports with equal protection if it is rationally related to a legitimate government interest. *Menefee v. Queen City Metro*, 49 Ohio St.3d 27, 29, 550 N.E.2d 181 (1990); *Brooks v. Ohio Bd. of Embalmers & Funeral Dirs.*, 69 Ohio App.3d 568, 573, 591 N.E.2d 301 (10th Dist.1990) (holding that an administrative

regulation is constitutional if it bears a rational relationship to a legitimate governmental interest.).

**{¶70}** Ohio Adm.Code 5120-5-03(D) authorizes the garnishment of an inmate's account to satisfy the inmate's obligations to the court as long as the account retains $25 for inmate expenditures.[2] Duhamel argues this regulation violates equal protection because it deprives indigent inmates of the gifts deposited into their prison accounts by family and friends.

**{¶71}** "'[C]osts are taxed against certain litigants for the purpose of lightening the burden on taxpayers financing the court system.'" *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, ¶ 14, quoting *Strattman v. Studt*, 20 Ohio St.2d 95, 102, 253 N.E.2d 749 (1969). "Although costs in criminal cases are assessed at sentencing and are included in the sentencing entry, costs are not punishment, but are more akin to a civil judgment for money." *Id.* Thus, the purpose of Ohio Adm. Code 5120-5-03 is the collection of a valid judgment to relieve the burden taxpayers would have to pay as a result of the convict's criminal actions. Therefore, Ohio Adm. Code 5120-5-03 is rationally related to a legitimate government interest and comports with equal protection. *See State v. Haynie*, 157 Ohio App.3d 708, 2004-Ohio-2452, 813 N.E.2d 686, ¶ 31 (3d Dist.2004) (holding that Ohio Adm. Code 5120-5-03 does not violate equal protection.).

**{¶72}** Accordingly, the seventh assignment of error is overruled.

---

[2] R.C. 5120.133(A) also permits the Ohio Department of Rehabilitation and Correction to deduct payments toward a certified judgment from a prisoner's account without any other required proceeding in aid of execution.

**{¶73}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

PATRICIA ANN BLACKMON, J., CONCURS;
LARRY A. JONES, SR., P.J., CONCURS IN JUDGMENT ONLY