[Cite as *State v. Waters*, 2022-Ohio-2667.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,             :

                             No. 110821

    v.                                        :

JAMES WATERS,                              :

    Defendant-Appellant.            :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 4, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652560-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Noelle A. Powell, Assistant Public Defender, *for appellant*.

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, James Waters, appeals the trial court's decision denying his motion to suppress and the court's imposition of a sentence pursuant to the Reagan Tokes Law. For the reasons that follow, we affirm.

## I. Procedural History and Background

{¶ 2} In August 2020, Waters was named in a four-count indictment charging him with one count of aggravated vehicular homicide, a first-degree felony violation of R.C. 2903.06(A)(1)(a) (Count 1); aggravated vehicular homicide, a second-degree felony violation of R.C. 2903.06(A)(2)(a) (Count 2); driving while under the influence of alcohol, a first-degree misdemeanor violation of R.C. 4511.19(A)(1)(a) (Count 3); and driving while under the influence of alcohol, a first-degree misdemeanor violation of R.C. 4511.19(A)(1)(d) (Count 4). Counts 1 and 2 contained furthermore specifications that at the time of the offense, he did not have a valid driver's license.

{¶ 3} The charges stemmed from a motor vehicle accident where Waters was alleged to have sped through a red light at the intersection of West 130th Street and Lorain Avenue. A truck turning left onto Lorain Avenue struck the backside of Waters's vehicle causing it to spin out of control and collide with a pole on the side of the road. Waters's aunt, Carmen Stewart, was seated in the backseat of his vehicle, sustained life-threatening injuries, and died as a result of the accident. Following field sobriety tests, Waters was arrested for driving under the influence of alcohol. It was later discovered that Waters did not have a valid driver's license, and a subsequent breath test yielded a blood alcohol content ("BAC") of .172.

{¶ 4} Waters filed a motion to suppress, contending that (1) there was no reasonable suspicion or probable cause to stop and detain him; (2) the officer administered the field sobriety tests in an inappropriate manner and location; (3)

the police obtained statements from him in violation of *Miranda*; and (4) the procedures used by police in collecting and testing his breath sample did not conform to the Ohio Administrative Code.

## II. Suppression Hearing

{¶ 5} Cleveland Patrol Officer Arthur Fessler testified that he responded to an accident at West 130th Street and Lorain Avenue. His interactions with Waters and witnesses were captured on his body camera, and portions of those interactions were played for the court.

{¶ 6} Officer Fessler identified Waters in the video as the man who was on the ground screaming. His body-cam video showed Waters then pounding on the ambulance door and attempting to open it. Officer Fessler can be seen trying to calm Waters down, but Waters cursed at him and pulled away. The body-cam video also showed Waters getting into an altercation with one of the eyewitnesses, accusing the witness of causing the accident. Waters can be heard stating that as he drove through the yellow light, his vehicle was struck, causing it to spin and crash into a pole.

{¶ 7} Officer Fessler testified that he decided to place Waters into the back seat of the police vehicle because of the altercation with the witness. He stated that he also held Waters because after Waters admitted that he was the driver of the vehicle, the strong odor of alcohol coming from him indicated that Waters may have been driving while under the influence. Officer Fessler testified that he did not

*Mirandize* Waters, but did not ask him any additional questions. According to Officer Fessler, Waters started yelling statements from the police vehicle.

{¶ 8} As part of his on-site investigation, Officer Fessler obtained statements from both independent eyewitnesses, who stated that their vehicle was stopped behind the pickup truck at a red light on Lorain Avenue. They stated that when the light turned green, the truck in front of them started turning left onto West 130th Street, and that a silver Toyota Camry "came out of nowhere" speeding through the light. According to the witnesses, the driver of the truck applied the brake, but struck the back end of the Toyota, causing it to spin out of control and crash into a pole. The female witness testified that she performed CPR on a female passenger of the Toyota. Video of the accident captured from a nearby surveillance camera was played for the court corroborating the statements.

{¶ 9} Detective Charles Moten of the Cleveland Police Department Accident Investigation Unit ("AIU") testified that AIU covers all major crashes and occasionally conducts field sobriety tests. He stated that he is a 21-year veteran of the police department, and worked in AIU for the past 12 years. He stated that he holds two certifications to conduct field sobriety tests and is an instructor on standardized field sobriety tests. According to Detective Moten, the National Highway of Traffic Safety Administration ("NHTSA") manual is 648 pages long and only substantial compliance with those guidelines was necessary.

{¶ 10} Detective Moten stated that he has conducted hundreds of field sobriety tests and made arrests in investigations involving vehicular accidents. He

provided a thorough explanation regarding the tests he conducts, including Horizontal Gaze Nystagmus ("HGN"), walk and turn, and single leg stand. Detective Moten explained that if there are clues of impairment the person is arrested, *Mirandized*, and then taken to the county jail where a breathalyzer test may be conducted.

{¶ 11} Detective Moten testified about his encounter with Waters, which was captured and recorded by his body camera. He stated Waters was seated in the back of the police cruiser, and as he was opening the cruiser door, he asked Waters about the accident and whether he had been drinking. Waters responded that someone hit him and that he had four beers about "two hours ago." Detective Moten testified that he could smell alcohol from Waters's person. He stated that he asked Waters to perform the HGN, walk and turn, and one leg stand tests.

{¶ 12} Regarding the HGN test, Detective Moten explained that he observed that Waters exhibited five out of the six indicators of impairment during the HGN — a lack of smooth pursuit in the left and right eyes; distinct and sustained nystagmus at maximum deviation in the left and right eyes; and the onset of nystagmus prior to 45 degrees in the right eye. Regarding the walk and turn test, Detective Moten testified that during the instruction phase of the test, Waters failed to maintain his standing position and attempted to start the test before being instructed to start. Additionally, Detective Moten stated that he observed Waters failing to touch heel to toe, and making an improper turn for a total of four clues of impairment during this test. Detective Moten testified that during the one-leg stand

test, he observed that Waters exhibited one clue of impairment by putting his foot down before being instructed. Detective Moten testified that based on his training and experience with alcohol-impaired drivers, he believed Waters operated his vehicle while under the influence of an alcoholic beverage due to his observations and Waters's performance of the standardized field sobriety tests. Accordingly, he placed Waters under arrest.

{¶ 13} On cross-examination, defense counsel questioned Detective Moten about how flashing or strobing lights may affect the eyes or results of the HGN test. He testified that in order for flashing lights to affect the eyes for purposes of the test, the lights have to be in close proximity and come straight into the eyes. Detective Moten testified, and the video showed, that the flashing lights from the zone cars were coming from behind Waters. Accordingly, he opined that the lights would not have affected Waters's test.

{¶ 14} Defense counsel also questioned Detective Moten on the comprehensive nature of his field report, specifically whether his report contained any information about the pretests he conducted prior to administering the HGN test. Detective Moten stated that he conducted pretests, including a medical impairment examination and whether he checked for contact lenses, but did not include this information in his report. He further admitted that he did not ask Waters about his eye health or general health conditions prior to administering the HGN, which is a requirement under the NHTSA guidelines.

{¶ 15} Officer Thomas Smith testified that he administered Waters's breathalyzer test. His interactions with other officers and Waters were captured on his body camera, and the video was played for the court.[1] Officer Smith stated that he is certified to use both the Data Master and Intoxilyzer 8000. He testified that he noticed an odor of alcohol coming from Waters. Officer Smith stated that he and his partner transported Waters to the county jail where the breath test was performed using the Intoxilyzer 8000. The test yielded a BAC level of .172. Officer Smith testified that during the testing process, Waters told him that he had two 24-ounce cans of beer earlier that evening. The body-cam video corroborated this testimony.

{¶ 16} The trial court admitted the following exhibits into evidence: body-cam video from Fessler, Moten, Smith, and Smith's partner; surveillance video of the accident; a copy of Officer Smith's Intoxilyzer 8000 certification card; the printed copy of Waters's BAC results; Moten's field report; and a copy of Session 8, Concepts and Principles of the Standardized Field Sobriety Tests published by the NHTSA, revised October 2015.

{¶ 17} On May 10, 2021, the trial court announced its decision in open court, denying the motion to suppress. The court focused its decision on Waters's argument that the HGN results were affected by the zone cars' flashing and strobing lights. The trial court explained:

---

[1] Video from Officer Smith's partner's body camera was also played during Officer Smith's testimony.

[T]he Court did have the opportunity to review the evidence, and one of the things in particular that it looked at was Defense Exhibit B, the Section 8, [we are] talking about the optokinetic nystagmus issues.

The Court, having read this and looked at all the evidence, is going to find as follows: That the defense suppression motion is not well-taken and it will be denied. We will proceed to trial. The issue of the optokinetics, if administered properly, which basically mandates the driver to look at the object, basically to the exclusion of everything else, will not be affected by, the way I read it, by flashing lights.

So it appears that nystagmus can be induced through strobe lights, but only when [they are] being observed directly; not when the attention and the focus is on the point of fixation that is being used in this case. So with that having been said, the Court is going to deny the motion.

(Tr. 136-137.)

{¶ 18} In July 2021, Waters pleaded no contest to the indictment. Following a sentencing hearing, the trial court ordered Waters to serve an aggregate minimum prison term of six years; but up to the maximum term under the Reagan Tokes Law of nine years.

{¶ 19} Waters now appeals, raising four assignments of error. The first two assignments of error relate to the Reagan Tokes Law; and assignments of error three and four pertain to Waters's motion to suppress. This court will address these assignments of error out of order and together where appropriate.

## III. Motion to Suppress

{¶ 20} In his third assignment of error, Waters contends that the trial court erred in denying his motion to suppress. He contends in his fourth assignment of error that his trial counsel rendered ineffective assistance of counsel by failing to request the trial court to issue findings of fact and conclusions of law.

{¶ 21} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. With regard to factual determinations, "[a]n appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 16, citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). "But the appellate court must decide the legal questions independently, without deference to the trial court's decision." *Id.*, citing *Burnside* at *id.*

{¶ 22} Waters moved to suppress all evidence against him, contending that (1) the arresting officer did not have reasonable suspicion to believe that he was driving under the influence; (2) the field sobriety tests were not conducted in substantial compliance with the NHTSA standards; (3) his *Miranda* rights were violated; and (4) the test results from the Intoxlyzer 8000 were unreliable.[2]

## A. Reasonable Suspicion

{¶ 23} In his suppression motion, Waters generally asserted that officers lacked reasonable articulable suspicion to believe that he was driving under the influence. On appeal, he specifically contends that the mere odor of an alcoholic beverage was an insufficient reason to detain him to perform field sobriety tests because his "trauma-driven behaviors" should be taken out of consideration.

---

[2] Although Waters raised four arguments in his motion to suppress, he has not raised any argument on appeal regarding the procedures used by police in collecting and testing his breath sample. Accordingly, we will not address that issue on appeal.

{¶ 24} Reasonable suspicion requires that the officer "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An officer may not request a motorist to perform field sobriety tests unless the request is separately justified by a reasonable suspicion based upon articulable facts that the motorist is intoxicated. *Cleveland v. Kalish*, 8th Dist. Cuyahoga No. 105557, 2018-Ohio-682, ¶ 19, citing *Parma Hts. v. Dedejczyk*, 8th Dist. Cuyahoga No. 97664, 2012-Ohio-3458, ¶ 29, citing *State v. Evans*, 127 Ohio App.3d 56, 62, 711 N.E.2d 761 (11th Dist.1998). "'A court analyzes the reasonableness of the request based on the totality of the circumstances, viewed through the eyes of a reasonable and prudent police officer on the scene who must react to events as they unfold.'" *Id.*, quoting *Dedejczyk* at *id.*, citing *State v. Dye*, 11th Dist. Geauga No. 2001-P-0140, 2002-Ohio-7158.

{¶ 25} A court may consider various factors when determining whether an officer had reasonable suspicion to administer field sobriety tests:

(1) the time of day of the stop (Friday or Saturday night as opposed to, e.g., Tuesday morning); (2) the location of the stop (whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ("very strong,["] "strong," "moderate," "slight," etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of

coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given. All of these factors, together with the officer's previous experience in dealing with drunken drivers, may be taken into account by a reviewing court in determining whether the officer acted reasonably.

*Dedejczyk* at ¶ 30, quoting *Evans* at 63, fn. 2.

{¶ 26} This court has explained that these factors are merely assistive guides in the determination of reasonable suspicion because no one factor is dispositive and the list does not represent an exhaustive account of factors that can or should be considered. *Dedejczyk* at ¶ 31, citing *State v. Boczar*, 11th Dist. Ashtabula No. 2004-A-0063, 2005-Ohio-6910, ¶ 14. Generally, courts approve a request to submit to field sobriety testing only where the officer based his or her decision on a number of these factors. *Evans* at 63.

{¶ 27} In this case, Officer Fessler testified that when he arrived on the scene of a fatal accident that occurred during the early morning hours, he witnessed Waters yelling and screaming, while trying to open the ambulance door where his aunt was being treated. He stated that during this interaction, he observed that Waters's eyes were bloodshot, he could smell a strong odor of alcohol coming from Waters, and when officers attempted to guide him away from the ambulance, Waters cursed at them and shrugged them away. Officer Fessler stated that during his investigation, he learned from the eyewitnesses, who assisted the occupants of Waters's vehicle, that Waters smelled of alcohol.

{¶ 28} Additionally, Officer Fessler testified about Waters confronting and threatening one of the eyewitnesses claiming that the witness caused the accident. During this altercation, Waters admitted to operating the vehicle — a fact that was unknown to Officer Fessler at the time — while speeding through a yellow light. According to Officer Fessler, Waters was slurring his words, pacing, acting belligerently, and threatening the eyewitness. Based on his observations and belief that Waters could be intoxicated, and for the safety of all persons, Officer Fessler decided to detain Waters in the back of his zone car for further investigation. He then contacted Detective Moten to initiate field sobriety tests.

{¶ 29} Detective Moten testified that when he arrived on scene, he conferred with Officer Fessler about his investigation and impressions. He stated that he then approached the zone car where Waters was seated and opened the door. According to Detective Moten, he could smell an odor of alcohol coming from Waters. He stated that Waters admitted to consuming four beers around midnight, and agreed to perform the field sobriety tests.

{¶ 30} Based on the foregoing, we conclude that Officer Fessler and Detective Moten's request to perform field sobriety tests was reasonable based on the totality of the circumstances.

## B. Field Sobriety Tests

{¶ 31} Waters contends that the trial court should have suppressed the results of the field sobriety tests because Detective Moten did not substantially comply with NHTSA standards and guidelines. Although Waters generally raised in

the trial court that Detective Moten did not substantially comply with the guidelines in his administration of all the field sobriety tests, he focuses his appeal on Detective Moten's testimony that he did not include in his report that he conducted any medical impairment examination or pretests. Accordingly, Waters contends that Detective Moten did not substantially comply with the NHTSA standards and guidelines.

{¶ 32} In order for the results of field sobriety tests to be admissible, the state must demonstrate that the officer substantially complied with NHTSA standards. R.C. 4511.19(D)(4)(b); *State v. Clark*, 12th Dist. No. CA2009-10-039, 2010-Ohio-4567, ¶ 11. "A determination of whether the facts satisfy the substantial compliance standard is made on a case-by-case basis." *State v. Fink*, 12th Dist. Warren Nos. CA2008-10-118 and CA2008-10-119, 2009-Ohio-3538, ¶ 26. The state may demonstrate what the NHTSA standards are through competent testimony and/or by introducing the applicable portions of the NHTSA manual. *Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, at ¶ 28. Even if a court finds that the officer did not substantially comply with the NHTSA standards (which would require the results of the tests to be excluded), the officer's testimony regarding the defendant's performance on nonscientific field sobriety tests is admissible under Evid.R. 701. *Dedejczyk*, 8th Dist. Cuyahoga No. 97664, 2012-Ohio-3458, at 43, citing *State v. Schmitt*, 101 Ohio St.3d 79, 2004-Ohio-37, 801 N.E.2d 446, ¶ 14-15.

{¶ 33} In this case, Detective Moten testified as to his qualifications as a police officer and to his training in conducting field sobriety testing. He further

testified about how he conducted each test and Water's performance on each test. Additionally, the state introduced the relevant portion of the NHTSA manual during Detective Moten's testimony.

{¶ 34} Specific to the argument raised on appeal, Detective Moten testified that he checked for medical impairments prior to administering the tests, but admitted that he did not include this information in his field report. Additionally, he admitted that he did not ask Waters about his eye health or general health conditions, which he agreed is contrary to the NHTSA manual's guidelines when conducting the HGN test.

{¶ 35} At the suppression hearing, the state played Detective Moten's body-cam video taken during the field sobriety tests. As the video played, he testified how he conducted each test and how Water's performed on each test. Additionally, the evidence showed that Detective Moten conferred with other officers prior to administering the tests, knew that Waters was involved in a traffic accident, and observed Waters exiting the zone car and walking to the testing location. The minor deviations or deficiencies of not asking Waters about his general health condition and failing to include in the report his assessment and impressions from the medical-impairment examination or pretests do not warrant suppression of the evidence obtained from the field sobriety tests. Accordingly, after reviewing the entirety of Detective Moten's testimony, body-cam video, and field report, we find that the state demonstrated that Detective Moten substantially complied with the NHTSA standards when conducting the field sobriety tests.

{¶ 36} Even if the court suppressed the results of the HGN test because Detective Moten did not ask Waters about his eye health or general health, probable cause remained to arrest Waters for OVI. According to Detective Moten's report and testimony, he observed four clues of impairment during the walk and turn test, and one clue of impairment during the one-leg stand test. Waters has not challenged these results on appeal. Accordingly, even excluding the HGN test results, sufficient evidence existed to establish probable cause to arrest Waters for OVI.

### C. *Miranda* Violation

{¶ 37} Waters contends that he was subjected to a custodial interrogation requiring *Miranda* warnings when he was seated in the police cruiser for 30-40 minutes and not free to leave. Accordingly, he maintains that the court should have suppressed his responses to Detective Moten's questions about the accident and whether he had been drinking.

{¶ 38} In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that custodial interrogations have the potential to undermine the Fifth Amendment privilege against self-incrimination by possibly exposing a suspect to physical or psychological coercion. *Id.* at 436. To guard against such coercion, the court established a prophylactic procedural mechanism that requires that a suspect receive a warning before custodial interrogation commences. *Id.* at 444. Individuals in custody must be warned, among other things, that they have a right to remain silent and that their statements may be used against them at trial.

{¶ 39} The Supreme Court has defined the term "custody" as the deprivation of "freedom of action in any significant way." *Id.* A person is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the encounter and leave. *Yarborough v. Alvarado,* 541 U.S. 652, 663-665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *State v. Martinez*, 8th Dist. Cuyahoga Nos. 103572 and 103575, 2016-Ohio-5515, ¶ 20. "The 'ultimate inquiry when determining whether an individual is in 'custody' for *Miranda* purposes is 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id*. at ¶ 24, citing *State v. Duhamel*, 8th Dist. Cuyahoga No. 102346, 2015-Ohio-3145, ¶ 22, quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

{¶ 40} In this case, officers placed Waters into the back of the police cruiser after he became combative with an eyewitness after accusing the witness of causing accident and then threatening the witness. Additionally, officers detained him for further investigation because they believed Waters was intoxicated due to the strong odor of alcohol emanating from him. Officer Fessler testified, however, that Waters was not free to leave once placed in the cruiser.

{¶ 41} Even if the statements Waters made to Detective Moten should have been suppressed, probable cause existed to justify arresting Waters. Based on Officer Fessler's and Detective Moten's observations and detection of an odor of alcohol emanating from Waters, they had reasonable suspicion to conduct field sobriety tests, which yielded clues that Waters was impaired. Accordingly, even

without Waters's statements that he drank four beers earlier that evening, there was probable cause to arrest Waters for operating a vehicle while intoxicated.

### D. Conclusion

{¶ 42} Based on the foregoing, the trial court did not err in denying Waters's motion to suppress. Having found no error, Waters was therefore not deprived of effective assistance of counsel when counsel did not request the trial court to issue separate findings of fact and conclusions of law.

{¶ 43} Waters's third and fourth assignments of error are overruled.

## IV. Reagan Tokes Law

{¶ 44} In his first and second assignments of error, Waters contends that he received ineffective assistance of counsel when counsel failed to object to the trial court imposing a sentence under the Reagan Tokes Law because the law is unconstitutional. He asserts the Reagan Tokes Law is unconstitutional because it violates the separation-of-powers doctrine, and his rights to a trial by jury and due process.

{¶ 45} Based on the authority established by this district's en banc holding in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), the challenges Waters advances against the constitutional validity of the Reagan Tokes Act have been overruled. *Id.* at ¶ 17-54. Therefore, even if counsel objected or challenged the constitutional validity of the Reagan Tokes Law, Waters's sentence pursuant to the Reagan Tokes Law is not a violation of his constitutional rights, and thus, Waters

has failed to demonstrate any prejudice to warrant a finding that his counsel was ineffective. Accordingly, his first and second assignments of error are overruled.

{¶ 46} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, JUDGE

ANITA LASTER MAYS, P.J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR

N.B. Judge Anita Laster Mays is constrained to apply *Delvallie's* en banc decision. For a full explanation of her analysis, *see State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.). (Laster Mays, J., concurring in part and dissenting in part).