[Cite as *State v. Ferrell*, 2021-Ohio-2826.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| STEPHEN FERRELL | : | Case No. 20 CAA 10 0046 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Court of  Common
                             Pleas, Case No. 19CRI100694


JUDGMENT:                    Affirmed


DATE OF JUDGMENT:            August 17, 2021


APPEARANCES:

For Plaintiff-Appellee                 For Defendant-Appellant

MELISSA A. SCHIFFEL                    APRIL F. CAMPBELL
CHRISTOPHER E. BALLARD                 46 ½ N. Sandusky Street
145 N. Union Street                    Delaware, OH  43015
3rd Floor
Delaware, OH  43015

*Wise, Earle, J.*

{¶ 1} Defendant-Appellant Stephen Ferrell appeals the October 23, 2020 judgement entry of the Delaware County Court of Common Pleas. Plaintiff-Appellee is the state of Ohio.

FACTS AND PROCEDURAL HISTORY

{¶ 2} On October 8, 2019, Delaware County Sheriff's Deputy Andrew Lee was dispatched to a Speedway gas station parking lot at approximately 11:30 p.m. An identified caller to 911 had described a loud argument between a man and a woman in separate vehicles in the gas station parking lot, which included screaming and the man yelling racial slurs. The caller was concerned the situation would soon erupt into physical violence. The caller provided dispatch with a description of the parties as well as their vehicles.  Lee activated his cruiser's overhead lights and drove to the scene.

{¶ 3} Lee arrived first on the scene. Upon arrival, he observed the black Range Rover described by the 911 caller stationary at the exit of the gas station with Appellant behind the wheel and dresses as described by the caller. The female involved and later identified as Appellant's friend Michelle was seated in her own stationary vehicle behind Appellant. Lee parked near the Range Rover, left his overhead lights activated, exited his cruiser and approached Appellant. Lee's body camera recorded the entirety of Lee's interaction with Appellant.

{¶ 4} Upon approaching Appellant, it was immediately apparent to Lee that Appellant was intoxicated. Appellant was alone in his vehicle and admitted he had just been in an argument with Michelle. Still clearly angry, Appellant asked Lee why he was being stopped. Because Lee immediately detected a strong odor of alcohol, noted

Appellant's eyes were bloodshot and that he was slurring some words, Lee asked Appellant if he had consumed alcohol that evening. Appellant denied he had and looked away from Lee. Before Appellant looked away, however, Lee had noticed nystagmus in Appellant's eyes.

{¶ 5}   Lee then questioned Appellant regarding his connection with Michelle and what they had been arguing about. Appellant stated Michelle had arrived at his home earlier, incessantly rang his doorbell, and then stabbed him in the neck with a shovel when he exited the house to get into his vehicle. He showed Lee a scrape on his neck. Appellant further stated they argued about him owing Michelle gasoline.

{¶ 6}   With this information Lee approached Michelle who admitted to being at Appellant's home and picking up a shovel, but denied striking Appellant with the shovel. She then stated if she did hit him she did not mean to do so. Asked if Appellant had been drinking, Michelle stated Appellant had consumed a couple "Twisted Teas" which Lee knew to be an alcoholic beverage. Michelle further stated after the two arrived at Speedway, Appellant had been loud and used the word "nigger".

{¶ 7}   Lee then returned to Appellant's vehicle and asked about the shovel incident. Appellant stated he did not want to pursue any charges against Michelle and asked if he could simply go home. Lee advised he could not because he was impaired.

{¶ 8}   Lee spoke with two other deputies at the scene and examined Appellant's record which indicated Appellant had four prior OVI offenses, three having occurred within the past 10 years. Lee then returned to Appellant's vehicle and asked him to perform field sobriety testing. Appellant considered the matter for some time before submitting to testing. From Lee's initial contact with Appellant until Appellant decided to submit to field testing, 27 minutes and 44 seconds elapsed.

{¶ 9} Lee first administered the horizontal gaze nystagmus (HGN) test and noted Appellant displayed six of six clues indicating impairment.

{¶ 10} Lee next began to administer the heel-to-toe walk by first having Appellant stand in a heel to toe stance with his arms down at his sides while Lee gave instructions. Because Appellant was unable to stand in this starting position without losing his balance, Lee moved on to other testing. Because Appellant stated he had previously broken an ankle and Lee skipped the one-leg stand test.

{¶ 11} Lee next asked Appellant to tip his head back, close his eyes and remain in that position until he believed 30 seconds had elapsed. Appellant held the position for 45 rather than 30 seconds. Lee also had Appellant recite a portion of the alphabet and count backward. Appellant performed these two tests correctly.

{¶ 12} Lee then asked Appellant about recent alcohol consumption and Appellant stated he had a couple beers. Another deputy present asked Appellant if he had three Twisted Teas and Appellant stated he had. Appellant was placed under arrest and into Lee's cruiser. At this point 43 minutes had elapsed since Lee first made contact with Appellant.

{¶ 13} On the way to the jail, Lee provided Appellant with his Miranda warnings and Appellant stated he understood the same. At the jail, after unsuccessful attempts to contact his attorney, Appellant submitted a breath test which registered 0.182, well over the legal limit.

{¶ 14} The Delaware County Grand Jury subsequently returned an indictment charging Appellant with two counts of operating a vehicle under the influence of alcohol or drugs. Appellant pled not guilty to the charges and filed a motion to suppress. In his motion Appellant alleged Lee lacked reasonable suspicion to stop Appellant's vehicle or

to ask him to perform field sobriety testing and failed to timely advise Appellant of his Miranda warnings. Appellant further argued Lee improperly delayed the investigation before administering sobriety testing and improperly administered those tests. Appellant also challenged the admissibility of statements he made before he was advised of his Miranda warnings and the validity of the breath test due to alleged unlawful coercion.

{¶ 15} On May 8, 2020, the trial court held a hearing on Appellant's motion wherein the above stated facts were elicited. Relevant portions of Lee's body camera video were played for the trial court during the suppression hearing as well as relevant portions of the 911 call.

{¶ 16} On June 5, 2020, the trial court issued its judgment entry denying Appellant's motion. On September 8, 2020, Appellant entered a plea of no contest to count two of the indictment, operating a vehicle under the influence of alcohol or drugs, a felony of the fourth degree and the trial court ordered a pre-sentence investigation. On October 23, 2020, the trial court sentenced Appellant to a three-year term of community control with various terms and conditions as well as an operator's license suspension. The trial court stayed Appellant's sentence pending the outcome of this appeal.

{¶ 17} Appellant timely filed an appeal and raises four assignments of error for our consideration as follow:

I

{¶ 18} "DEPUTY LEE DID NOT HAVE REASONABLE SUSPICION THAT FERRELL WAS ENGAGED IN A CRIMINAL ACTIVITY SUFFICIENT TO ENGAGE IN AN INVESTIGATIVE STOP OF FERRELL'S VEHICLE."

II

{¶ 19} "THE EVIDENCE AGAINST FERRELL SHOULD HAVE BEEN SUPPRESSED, BECAUSE THE DEPUTY'S STOP OF FERRELL WAS UNREASONABLY PROLONGED."

III

{¶ 20} "FERRELL'S STATEMENTS MADE IN RESPONSE TO QUESTIONING ABOUT HIS ALCOHOL CONSUMPTION, AS WELL AS HIS PERFORMANCE AT DEPUTY LEE'S REQUEST ON THE FIELD SOBRIETY TESTS, SHOULD HAVE BEEN SUPPRESSED: FERRELL WAS IN CUSTODY AT THAT TIME WITHOUT BEING *MIRANDIZED*."

IV

{¶ 21} "THE BREATH TEST TO WHICH FERRELL SUBMITTED SHOULD HAVE BEEN SUPPRESSED BECAUSE FERRELL WAS UNCONSTITUTIONALLY COERCED INTO GIVING IT."

STANDARD OF REVIEW

{¶ 22} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141(1991); *State v. Guysinger*, 86 Ohio App.3d 592, 621 N.E.2d 726(1993). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *State v. Williams*, 86 Ohio App.3d 37, 619 N.E.2d 1141

(1993). Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 641 N.E.2d 1172 (1994); *State v. Claytor*, 85 Ohio App.3d 623, 620 N.E.2d 906 (1993); *Guysinger*, supra. As the United States Supreme Court held in *Ornelas v. U.S.*, 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996), "... as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."

{¶ 23} We keep in mind that when ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. See *State v. Dunlap*, 73 Ohio St.3d 308, 314, 1995-Ohio-243, 652 N.E.2d 988; *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982).

I

{¶ 24} In his first assignment of error, Appellant argues Lee lacked reasonable suspicion to conduct an investigatory stop. We disagree.

{¶ 25} A police officer may make an investigatory stop of a vehicle when they have a "reasonable articulable suspicion" criminal activity has occurred or is occurring, and the officer seeks to confirm or refute this suspicion of criminal activity. *State v. Weinheimer*, 12th Dist. Warren App. No. CA2003-04-044, 2004-Ohio-801, ¶ 8. See, also, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶ 26} Reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Alabama v. White* (1990), 496 U .S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). But it requires something more than an "inchoate and unparticularized suspicion or 'hunch'." *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Whether an officer acted with "reasonable suspicion" requires consideration of the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621(1981).

{¶ 27} In the instant matter, Deputy Lee's information came from a 911 caller. "Where the information possessed by the police before the stop was solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the weight to be given the tip and the reliability of the tip." *Maumee v. Weisner*, 87 Ohio St.3d 295, 299, 720 N.E.2d 507 (1999). Courts have generally identified three classes of informants: the anonymous informant, the known informant from the criminal world who has provided previous reliable tips, and the identified citizen informant. *Id*. at 300, 720 N.E.2d 507. An identified citizen informant may be highly reliable, and therefore a strong showing as to other indicia of reliability may be unnecessary. *Id*. Thus, courts have routinely credited the identified citizen informant with greater reliability. *Id*.

{¶ 28} The instant matter began not as an impaired driving call, but rather as a 911 call from an identified citizen informant involving a dispute at a gas station at 11:30 at night. Lee was dispatched to Speedway regarding "a domestic" requiring prompt attention which the identified citizen caller described as "fighting," "screaming," and "racial slurs." The caller further believed "it's gonna get violent." State's exhibit 2.

{¶ 29} Upon arrival at the scene, Deputy Lee observed vehicles and occupants matching the descriptions given by the 911 caller and approached Appellant who was seated in his stationary vehicle. As noted by the trial court and our own observations in reviewing Lee's body camera footage, the intrusion here was minimal. Lee did not block the path of Appellant's vehicle or compel him to stop, but merely approached his already-stopped vehicle to inquire about the alleged fight. It was only upon Lee's approach that the investigation also became a driving under the influence investigation. State's exhibit 3, Transcript of Suppression Hearing (T.) at 15.

{¶ 30} Appellant argues he was stopped for using profanity which is protected speech and therefore Lee had no reasonable, articulable suspicion to conduct and investigative stop because there was no allegation that a crime was afoot. The record, however, does not support this conclusion. Rather, at minimum Appellant through his actions caused inconvenience, annoyance or alarm to others at the gas station by engaging in fighting or turbulent behavior, a violation of R.C. 2917.11(A)(1). Indeed at least one person was alarmed enough to call 911. Additionally, the caller feared the situation would escalate to physical violence.

{¶ 31} Under the facts of this case we find Deputy Lee possessed a reasonable suspicion Appellant was violating the law which justified a brief investigatory stop of Appellant. The first assignment of error is overruled.

II

{¶ 32} In his second assignment of error, Appellant argues the evidence against him should have been suppressed because Lee's stop of Appellant was unreasonably prolonged. We disagree.

{¶ 33} " '[W]hen detaining a motorist for a traffic violation, an officer may delay a motorist for a time period sufficient to issue a ticket or a warning.' " *State v. Batchili*, 113 Ohio St.3d 403, 865 N.E.2d 1282, 2007-Ohio-2204, at ¶ 12, quoting *State v. Keathley*, 55 Ohio App.3d 130, 131, 562 N.E.2d 932 (1988). "This measure includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates." *Id.*, citing *State v. Bolden*, 12th Dist. Preble No. CA2003-03-007, 2004-Ohio-184, ¶ 17, citing *Delaware v. Prouse*, 440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Further, " '[i]n determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' " *Id.*, quoting *State v. Carlson*, 102 Ohio App.3d 585, 598-599, 657 N.E.2d 591 (1995), citing *State v. Cook*, 65 Ohio St.3d 516, 521-522, 605 N.E.2d 70 (1992), and *United States v. Sharpe* (1985), 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

{¶ 34} We have carefully reviewed Lee's body camera footage which is State's Exhibit 3.

{¶ 35} From 1:07 to 6:05 on State's Exhibit 3, the video of the stop, Lee approached Appellant's stationary vehicle to speak with Appellant. Lee told Appellant why he was dispatched to the scene, immediately noticed Appellant was impaired, and asked him to step out of the car. Appellant remained seated in his vehicle and advised he would not participate in field sobriety testing. Lee told Appellant he could tell he had been drinking due to the odor of alcohol, the fact Appellant was slurring some words, and his bloodshot eyes. Lee then asked Appellant about the fight with Michelle and Appellant told Lee Michelle had stabbed him in the neck with a shovel and showed Lee a scrape on his neck. Appellant then told Lee "do me a favor and just talk to her." Thus, upon making

contact Appellant, Lee's investigation immediately became three-fold; investigating the disturbance caused at the gas station, an alleged assault, and Appellant's apparent intoxication.

{¶ 36} From 6:12 to 11:04 Lee talked to Michelle to gather her side of the story. She indicated Appellant owed her gasoline which is why they were at the gas station. Michelle admitted she wielded a shovel against Appellant while they were at his home, but denied actually hitting him. She advised Lee that Appellant had been in a "rage" and further had consumed Twisted Tea alcoholic beverages.

{¶ 37} From 11:13 to 12:54 Lee consulted with another deputy on the scene regarding their history with Appellant, the fact that Appellant is drunk, and the fact that Appellant has responded with violence against deputies in their prior experiences with him. Lee also talked to a third deputy on the scene who had been talking to the 911 caller and other witnesses who had remained on the scene to confirm the initial report.

{¶ 38} From 12:55 to 13:26 Michelle again engaged Lee in discussion regarding the situation.

{¶ 39} At 13:27 Lee returned to Appellant's vehicle. Upon further discussion with Lee Appellant slurred "I got super loud here, lets just make that clear." He advised Lee he had been angry about the shovel incident and then Michelle failing to help him pump gas into both of their vehicles. Appellant did not, however, desire to press charges against Michelle for striking him with the shovel. He then began bargaining with Lee to let him go home. Lee asked if there was anyone who could drive him home and the only person Appellant could name was Michelle. Given the situation, Lee could not allow Michelle to take Appellant home.

{¶ 40} With this information, at 17:25 on the video, Lee consulted with the two other deputies on the scene and advised Appellant had no one who could take him home. The three discussed the shovel incident and concluded it was likely self-defense as alleged by Michelle due to the vast size disparity between the two. The deputies then discussed the fact that Appellant was clearly impaired, could not drive, and that given their previous interactions with Appellant getting him out of the car would "be a fight." Lee decided he would take Appellant home if he passed the sobriety tests. Lee then sent one deputy to get a statement from the 911 caller so he could leave, and ran a driving record check on Appellant. Lee's research revealed this incident would be Appellant's fourth driving under the influence charge within 10 years.

{¶ 41} At 26:39 on the video Lee again contacted Appellant, explained the possible charge based on Appellant's prior record and again asked Appellant if he was willing to perform field sobriety tests. Lee advised he would take Appellant home if he passed the tests. After some consideration, from 27:44 to 28:20 on the video, Appellant got out of the car to perform the tests.

{¶ 42} Our viewing of State's Exhibit 3 and consideration of the totality of the circumstances herein confirms that during the 27:44-minute period from contact with Appellant to Appellant's decision to submit to field sobriety testing, Lee was engaged in legitimate investigation of issues presented to him. We therefore conclude the stop of Appellant was not unreasonably prolonged.

{¶ 43} The second assignment of error is overruled.

III

{¶ 44} In his third assignment of error, Appellant argues his statements to Lee regarding his alcohol consumption as well as his performance on the field sobriety tests

should have been suppressed because he was in custody and had not been provided with his *Miranda* warnings. We disagree.

{¶ 45} These two issues are well settled. First, a stop like the one presented here does not rise to the level of a custodial interrogation or formal arrest. Appellant here was asked about alcohol consumption while he was seated in his own vehicle in the parking lot of a gas station. He was not questioned while seated in a police cruiser or a police interrogation room, nor while he was handcuffed. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the United States Supreme Court held that roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" under the rule announced in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). Because Appellant was not in custody, *Miranda* warnings were not required.

{¶ 46} Next, the Ohio Supreme Court has held that physical field sobriety tests are real or physical evidence and are not statements or testimony. The nonverbal results of such tests are therefore not self-incriminating statements protected by the constitutional privilege against self-incrimination. *State v. Henderson*, 51 Ohio St.3d 54, 57, 554 N.E.2d 104 (1990); *Piqua v. Hinger*, 15 Ohio St.2d 110, 238 N.E.2d 766 (1968) paragraphs one and two of the syllabus. The failure to advise Appellant of his rights under *Miranda* prior to his performance of sobriety tests does not therefore render the results of such tests inadmissible.

{¶ 47} The third assignment of error is overruled.

IV

{¶ 48} In his final assignment of error, Appellant argues his breath test should have been suppressed because he was unconstitutionally coerced into giving it. We disagree.

{¶ 49} Appellant appears to argue he was threatened with a forced blood draw at the scene and therefore was coerced into submitting to a breath test later at the jail. Appellant does not cite to a specific point in State's Exhibit 3 where this was alleged to have taken place. From our own observations we note that at no point during Lee's conversations with Appellant at the scene was a forced blood draw ever mentioned. Lee did mention the possibility while talking with other deputies on the scene. However, Lee mentioned the possibility based on Appellant's previous combative behavior with deputies. Further this conversation took place while Lee was quite removed from the area of Appellant's vehicle and in a noisy environment on a busy road.

{¶ 50} During the suppression hearing Appellant testified briefly on his own behalf to allege he heard this conversation between Lee and the other deputies. He further stated he had been subjected to a forced blood draw on a previous occasion in 2012. T. 55-57. On cross-examination, however, Appellant admitted that outside of a blood draw being mentioned in a BMV form Lee was required to read appellant before his breath test, he and Lee never discussed a forced blood draw. T. 58.

{¶ 51} The record simply fails to support Appellant's allegation that Lee threatened Appellant in order to procure his cooperation with a breath test. In any event, "[a]s part of obtaining the privilege to drive in Ohio, a driver implicitly consents to a search, through means of a chemical test, to determine the amount of intoxicating substances in the driver's body, upon the driver's arrest for DUI." *State v. Hoover*, 123 Ohio St.3d 418, 2009-Ohio-4993, 916 N.E.2d 1056, ¶ 14.

{¶ 52} The final assignment of error is overruled.

{¶ 53} The judgment of the Delaware County Court of Common Pleas is affirmed.

By Wise, Earle, J.

Baldwin, P.J. and

Hoffman, J. concur.

EEW/rw

[Cite as *State v. Ferrell*, 2021-Ohio-2826.]