[Cite as *Fairview Park v. Bowman*, 2023-Ohio-4210.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF FAIRVIEW PARK,  :

    Plaintiff-Appellee,  :

                      No. 112300

    v.  :

TED BOWMAN,  :

    Defendant-Appellant.  :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 22, 2023

Criminal Appeal from the Rocky River Municipal Court
Case Nos. 21-TRC-02274 and 21-CRB-00971

### *Appearances:*

John T. Castele, City of Fairview Park Assistant Director
of Law and Prosecutor, *for appellee.*

Gary Cook; James Alexander, Jr., Esq., LLC, and James
Alexander, Jr., *for appellant.*

ANITA LASTER MAYS, A. J.:

{¶ 1} Defendant-appellant Ted Bowman ("Bowman") appeals his convictions for operating a vehicle under the influence of alcohol ("OVI") under Fairview Park Codified Ordinances 333.01(A)(1)(a) and operating a vehicle with an

open container of alcohol ("Open Container") under Fairview Park Codified Ordinances 529.07(B)(4). We affirm the trial court's judgment.

## I. Procedural History

{¶ 2} On June 28, 2021, at approximately 10:00 p.m., Bowman was cited for OVI and Open Container and pleaded not guilty on June 30, 2021. On July 9, 2021, Bowman served discovery on the state. On August 10, 2021, Bowman filed a motion to suppress and a motion in limine. A hearing was conducted on April 25, 2022, after which the trial court denied the motions.

{¶ 3} On September 26, 2022, Bowman filed a second motion in limine to bar the admission of the state's video evidence that was provided by the city just six days before trial. On September 27, 2022, Bowman's trial brief was filed. A jury trial was held on September 27, and September 28, 2022. Bowman made a Crim.R. 29 motion for judgment of acquittal, which was denied. Bowman was convicted of both counts and fined $400 and $100, respectively, plus court costs. He also received an administrative license suspension for one year less credit of 365 days.

{¶ 4} Bowman filed a motion for a new trial on October 12, 2022, that was denied on November 30, 2022.

{¶ 5} Bowman appeals.

## II. Facts

{¶ 6} On June 28, 2021, off-duty detective sergeant Matthew Beck ("Det. Beck") of the North Olmsted Police Department testified that he worked at the bureau from 6:00 a.m. to 4:00 p.m. and for traffic enforcement on I-480 until 10:00

p.m. At approximately 10:00 p.m., Det. Beck headed south on Dover Road from the police station located at Dover and Lorain Roads. He stopped at the red light at the intersection of Butternut and Dover Roads behind an older white Oldsmobile.

{¶ 7} The detective testified that the Oldsmobile turned east (left) onto Butternut Ridge and the "right front [passenger side] wheel struck the curb on Butternut Ridge, which sparked my attention." (Tr. 26.) Instead of turning right to go home, Det. Beck followed the vehicle, observed it weaving and crossing the double yellow line and the white fog line and informed dispatch that he was "probably behind a drunk." (Tr. 27.) License plate information provided the owner's name and address and determined they had driven past the driver's residence. (Tr. 28.) The Oldsmobile turned northbound (left) onto Columbia Road and continued to weave, crossing the yellow and white lines.

{¶ 8} The vehicles were approaching Fairview Park's jurisdiction at Mastick Road. The dispatcher reached out to the Fairview Park Police Department to intercept a "possible OVI," described the vehicle, and advised that the North Olmsted officer was following the Oldsmobile. Det. Beck stated he ultimately had to contact Fairview Park Officer Kelley ("Officer Kelley") directly until Officer Kelley stopped the Oldsmobile "northbound on West 220th between Mastick and Lorain Road." (Tr. 34.)[1] Det. Beck remained at the stop until a Fairview Park officer arrived and advised that officer what he had witnessed.

---

[1] Officer Kelley testified that he did not speak with Det. Beck and had to locate him and the Oldsmobile.

{¶ 9} Det. Beck testified he followed the Oldsmobile for approximately ten minutes. He did not pull the driver over because he was driving his personal vehicle, a Toyota pickup truck. Pulling over the Oldsmobile while driving his personal vehicle was "against the law and against our policy." (Tr. 41.) Det. Beck stated, "he could have" arrested the driver after the Oldsmobile entered Fairview Park but he did not, nor did Officer Kelley initially. Det. Beck was able to view the back of the driver's head because it was illuminated by his truck's headlights but never saw Bowman directly.

{¶ 10} The detective parked in front of the Oldsmobile during the stop but did not approach the vehicle. He and Officer Kelley discussed their observations with Officer Mike Thompson ("Officer Thompson") of Fairview Park who arrived at the scene shortly thereafter.

{¶ 11} Officer Kelley was working a 6:00 p.m. to 6:00 a.m. shift the night of the incident. Officer Kelley recounted his OVI training and experience and testified that he responded to a dispatch request. He finally located the Oldsmobile in the West 220th Street and Mastick Road area of Fairview Park. Mastick Road is a "contiguous roadway between North Olmsted and Fairview Park." (Tr. 46.)

{¶ 12} The officer observed:

The vehicle was weaving in its own lane as well as crossing over into the continuous left-turn lane, shared left-turn lane. And then at one point for — not sure approximately how long, but for a pretty good distance, was driving straight down the middle of the continuous left turn lane.

(Tr. 48.)

{¶ 13} Officer Kelley initiated the stop in Fairview Park because the dispatch call was received when the vehicle was in North Olmsted, though he admitted he never observed violations that occurred in North Olmsted. He determined that exigent emergency circumstances existed to initiate the stop in Fairview Park due to the danger posed to the public by Bowman's weaving and driving down the center left turn lane.

{¶ 14} Bowman reportedly fumbled with his driver's license as he handed it to the Officer Kelley.[2] In response to questions by Officer Kelley, Bowman stated he was going to his mother's house and that he had consumed three beers earlier in the evening, though he did not specify what time period.[3] (Tr. 68.)

{¶ 15} Bowman exhibited glassy eyes but no other physical signs of impairment and Officer Kelley did not smell alcohol during the encounter. About three to five minutes into the stop, Officer Thompson arrived and took over. Officer Kelley left the scene a few minutes later. He recalled preparing a short report that was later provided to Officer Thompson.

{¶ 16} Officer Thompson testified he spent ten years with the Fairview Park police department but joined the Westlake police department six months prior to trial. He was trained in alcohol detection, apprehension, and prosecution, and advanced roadside impaired driver enforcement.

---

[2] The Officer Kelley approached Bowman on the passenger's side of the vehicle.

[3] Bowman testified that he had two beers. The record reflects that two beer cans were recovered.

{¶ 17} Officer Thompson monitored the shared channel with North Olmsted after being notified by dispatch of the situation where he heard Det. Beck's conversations with North Olmsted dispatch. Officer Thompson had no independent knowledge based on personal observation of Bowman's erratic driving.

{¶ 18} Officer Thompson arrived at the scene where Officer Kelley explained he suspected possible impairment. Officer Thompson testified:

> I had a short conversation with Mr. Bowman, observed that he had slurred speech. He looked like he was going to fall asleep. So, typically, I ask if someone has a medical issue. It wasn't expressed to me that he did. So, while speaking to him, slurred speech and glassy eyes and drooping like he's about to fall asleep.

(Tr. 74.)

{¶ 19} After explaining the factors that he looked for to determine impairment, Officer Thompson added "when he was out of the vehicle, [he] used, tried to use the vehicle for kind of like a crutch. Like, showing lack of balance. Very deliberate, short, choppy steps and didn't look stable on his feet." (Tr. 75.) Officer Thompson said that Bowman was also unable to perform pre-exit tests employed prior to a suspect exiting the vehicle. The first test required that Bowman recite the alphabet from C to S without singing it. Bowman mixed up the letters. Bowman was also unable to perform the Horizontal Gaze Nystagmus ("HGN") test that required that he follow the tip of the officer's finger with his eyes.

{¶ 20} Officer Thompson stated that the Fairview Park officers did not have body cameras that night and the only cruiser equipped with a dash cam belonged to Officer Barnie ("Officer Barnie") who also had the audio pack. This court's review

of the video shows Officer Barnie arrived at the scene just as Bowman exited the car for field sobriety testing. Fairview Park Sergent Jeffrey Jurcak ("Sergent Jurcak") had already arrived.

{¶ 21} Officer Thompson narrated that he next searched Bowman and instructed him to step over to the sidewalk. Bowman appeared to slightly lose his balance at the beginning of the gaze test. Officer Thompson stated he told Bowman that he turned his head instead of holding it still and moving his eyes only. The officer also stated that when Bowman held his head still, he was not watching the finger move but was looking straight ahead though Bowman responded that he could see the finger.

{¶ 22} As Officer Thompson testified and the video supports, Bowman appeared to have difficulty walking the imaginary line using heel to toe steps though he finished well until he stumbled turning around. He next attempted to stand on one foot and count but was unable to hold his foot off the ground. He was then arrested. Officer Thompson agreed that someone who stayed up for 24 hours and has a beer or two may appear to be under the influence and not test over the legal limit. Officer Thompson said to the other officers that he did not smell alcohol but Officer Barnie can be heard and seen at the end of the video saying that he "thought" he smelled alcohol coming from Bowman. Officer Thompson testified he was unable to complete the tests due to "lack of compliance is what I would — the way I would put it. * * * [e]ither [Bowman] wasn't following directions or not able to follow the directions." (Tr. 85.)

{¶ 23} During cross-examination, Officer Thompson confirmed that he did not smell alcohol on Bowman and did not list it in his report. Though Bowman's license indicated that he wore corrective lenses, the officer did not recall that Bowman was wearing glasses. The officer did not consider that the headlights from Det. Beck's truck may have impacted Bowman's driving, and he could not recall hearing the details of what transpired from Det. Beck. Officer Thompson could not specifically recall that gas line construction was being conducted in the area of the incident and did not check the road for construction street markings in the area where Officer Kelley followed Bowman prior to the stop.

{¶ 24} Defense counsel pointed out that, as Officer Thompson reported, Bowman had no prior OVIs and possibly did not understand the impairment test instructions. The officer also noted in his report that Bowman stated he would provide a breath sample, but the test resulted in an improper reading the first time. Officer Thompson explained that Bowman was given a second chance because sometimes people are unable, unwilling, or pretend they are blowing into the machine. However, the report indicated that Bowman made the request to test a second time.

{¶ 25} Officer Thompson read the report excerpt:

When asked if he would provide a breath sample, [Bowman] stated that he would. Patrolman Calabrese gave him an opportunity to provide a breath sample. Again, Bowman was either unable or unwilling to follow the directions given for the test. He was given a second chance, per his request, to give a breath sample. He, again, was not able or willing to follow directions and the test was marked as a refusal.

(Tr. 129.) Patrolman Calabrese marked that the test was refused. The patrolman was no longer with the Fairview Park Police Department at the time of trial and was not called as a witness in the case.

{¶ 26} Counsel asked why Bowman was not taken to Fairview Hospital approximately two miles away for a blood or urine test as authorized by Fairview Park Codified Ordinance 333.01.

> Counsel: And Mr. Bowman didn't refuse to take either a urine test or a blood test, did he?
>
> Witness: By his — not his words, his actions, he refused to take a breath test, yes.
>
> Counsel: Okay. All right. And so, again, we don't have the video of that encounter between you and Mr. Bowman at the station, do we?
>
> Witness: Not to my knowledge.

(Tr. 130-131.)

{¶ 27} During redirect, over defense objections that the matter was outside the scope of cross-examination, the officer testified he would have advised Bowman of the penalties and vehicle sanctions for an OVI such as refusing to take the breathalyzer, the option to submit blood and urine samples, and having a high alcohol level as stated on Form BMV 2255. "I would have read it [aloud] because I signed it. So, I read the back of the form that would have told him the penalties for refusing or for a high blood alcohol content." (Tr. 140.)

{¶ 28} The city also presented a photograph purported to depict the road conditions in the area at the time of the incident. Officer Thompson appeared to

represent the conditions at the time. During recross-examination, the officer testified that he had no idea when the picture was taken or whether it accurately reflected the construction conditions and road lines at the time of the incident.

{¶ 29} During recross-examination, Officer Thompson confirmed that he did not smell alcohol and did not test the contents of the container found in the vehicle. Officer Thompson indicated on the BMV 2255 form that Bowman refused to take the breathalyzer test. Bowman was not taken for a urine or blood sample because the department typically did not conduct those tests unless drugs or something else is suspected and, because the officers determined that Bowman's lack of breathalyzer success constituted a refusal versus an inability to blow, the other tests were not administered.

{¶ 30} Officer Thompson said he did not inventory Bowman's vehicle that was towed and impounded for inventory purposes after Bowman's arrest but did recall seeing an open container in the vehicle as Bowman exited. This court's review of the dashcam video revealed that after Bowman had been placed in the police cruiser, Officer Thompson opened the driver's side of Bowman's vehicle and looked inside while Sergent Jurcak, joined by Officer Barnie, stood on the passenger side with a flashlight. Officer Thompson eventually located a container in the vehicle and placed it on top of the vehicle where it was photographed. The officers also checked the vehicle for Bowman's cell phone that Bowman believed he left in the car.

{¶ 31} Fairview Park Officer Barnie was with the Westlake Police Department at the time of trial and had worked for Fairview Park Police Department for five years where he was employed the night of the incident. Officer Barnie responded to a dispatch announcement that "North Olmsted had a police officer that was following a reckless op on Mastick Road and North Olmsted was dispatched to that area along with Fairview Park." (Tr. 162.) Officer Barnie testified that based on his training and experience, Bowman was intoxicated.

{¶ 32} Officer Barnie confirmed during cross-examination that he said on the dashcam video that he thought he smelled something on Bowman during the sidewalk sobriety testing but testified at trial that he "definitely" smelled something. He explained that was "just how I decided to phrase it, yes, I thought I smelled something, yeah." (Tr. 176.)

{¶ 33} Officer Barnie was not aware of any tests of the open container removed from Bowman's vehicle but believed it contained alcohol because of the container information and odor. He did not recall whether there were road aberrations due to the gas line construction in the area that night.

{¶ 34} Sergeant Jurcak of the Fairview Park Police Department confirmed that the container depicted in the exhibit photograph was the one removed from Bowman's vehicle and stated that he conducted the pre-tow inventory. A smashed container with the same label was in the back seat along with several bags of groceries that Bowman said were for his mother. The officer delivered the groceries to Bowman's mother who resided in Fairview Park approximately two miles from

the scene. There were also a few miscellaneous items such as a paper towel, napkins, and what appeared to be wood chips.

{¶ 35} The city rested. Bowman's Crim.R. 29 motion for judgment of acquittal was denied.

{¶ 36} Bowman took the stand and testified he has lived at the same residence in North Olmsted since 1975, except for a two-year period in the 1980s and obtained a Bachelor's Degree from what was then known as Baldwin-Wallace College where his father was a professor. Sixty-six years old at the time of trial and 65 at the time of the incident, Bowman, who possessed a commercial driver's license, worked 30 years operating an excavating contracting business and for the past eight years was a truck driver hauling expedited freight to and from Chicago.

{¶ 37} Bowman usually left for Chicago at night, dropped off deliveries, slept, picked up items for transport and returned home in the early morning. Bowman returned home during the early morning hours of June 28, 2021, unloaded the trailer, and drove his 1990 Oldsmobile Regency Brougham sedan to his 93-year-old mother's home in Fairview Park where he slept a few hours and then took his mother to breakfast. Bowman has been her sole caregiver.

{¶ 38} Bowman took his mother home about 2:00 p.m. and went to his seven and one-half acre property in Olmsted Falls consisting of vacant, industrial land and trees to perform property maintenance. The temperature was about 88 degrees that day but Bowman said, "it felt like 99." (Tr. 211.) He picked up a couple of cans of Redd's Wicked Ale and consumed them at the property.

{¶ 39} Bowman left the property about 8:00 p.m., stopped to pick up groceries for his mother, stopped by his house, and headed to his mother's house with the groceries about 9:45 p.m. He was sitting at the light at Dover and Butternut Ridge Roads when a truck or SUV with bright headlights pulled up behind him. Blinded by the bright lights that also made vision through the filmy windshield difficult, he turned left and noticed he was a little farther right than he thought and made the adjustment.[4] Bowman denied he was weaving or hit the curb.

{¶ 40} Bowman described the gas line construction at Mastic Road and West 220th Street and said that the city's exhibit of the road did not depict the state of the road at the time of the incident. Counsel inquired, "[Y]ou heard Officer Kelley and I believe it was [Det.] Beck [say] that you were driving your vehicle continually in the left turn lane[?]" (Tr. 218.)

{¶ 41} Bowman explained:

North of the bridge, they had done gas line replacement work on West 220th Street from the fall of 2020 and they had only wrapped it up about maybe three weeks prior, early to mid June. * * *

In which case the traffic was in the left side of the road, the west side of the road. And there was a line of barrels separating what was one north and one southbound lane. Then you had a row of barrels to the right of the northbound lane. Then you had a row of barrels to the right of the northbound lane and then you had a row of barrels to the right of the

---

[4] Det. Beck testified that he could see the back of what appeared to be a woman's head illuminated by his headlights when he was behind the Oldsmobile.

northbound lane and then you had a drop-off where all of that pavement had been removed so they could do their excavation. * * *

The pavement on the east lane, the northbound lane east about third of the road had been removed for the gas line replacement. It was new concrete and it had not been marked yet. * * *

Well, the last markings I had were going across the bridge where I was * * * in the left half of the right half of the pavement. * * * [T]here was no markings to the contrary. And I continued on that basis until I got to where the excavation had stopped * * * at which point you inherit some old lane markings. So, I was just sizing up to get into those lane markings when the [police] lights came on. * * *

(Tr. 218-220.) Bowman stated that "the entirety of the time, I had Det. Beck's truck following me with the bright lights * * * and I thought when the police lights were activated it was for the truck behind me." (Tr. 220.)

{¶ 42} Bowman said his eyes were irritated and bloodshot from sweat and chaff from working at his property and he left his glasses at home. Officer Kelley requested his license — which indicated that he wore corrective lenses — and Officer Thompson returned in his stead. While in the automobile, Officer Thompson asked Bowman to have his eyes follow a moving pen.

{¶ 43} Bowman narrated portions of the video and stated he did not refuse to follow test directions. The then 65-year-old stated he had trouble with his legs and tried to stand on one leg but was unable to. He was then arrested for intoxication.

{¶ 44} Bowman waited in the cell for 20 to 30 minutes and was seated in another room for breathalyzer testing by Officer Callahan and he believed Officer Thompson was present. For both tests, "[t]hey said I started out fine with

the volume and all but I ran out of wind." (Tr. 232.) "I gave them everything I had, but for whatever reason, either they didn't like the reading they got or it genuinely didn't work, but they said they were unable to get a sufficient sample." *Id*. "They did not offer any other test." *Id*. The tests were recorded as refusals.

{¶ 45} Bowman explained that he did not and would not refuse a drug or alcohol test because that would result in an automatic one-year suspension of his commercial license that also indicated that he wore corrective lenses. Bowman summarized that he had a long day, suffers from physical limitations due to past injury and age, the weather was very hot and humid, his car did not have operable air-conditioning, he consumed the two cans of ale at his property earlier in the day when cutting the grass, was not wearing his glasses, road lines were altered or missing due to the gas line instruction, and he had driven from his home to his mother's house numerous times.

{¶ 46} During cross-examination, Bowman stated he did not see the indication on the BMV-2255 form that he could take a chemical or urine test at his own cost because he did not receive the form until the next day. The form was not read to him as was stated on the form and it inaccurately indicated that he refused to sign but it was never requested. Bowman also said the liquid in the container located in the vehicle console was tart cherry juice that he poured into the can because it fit into the cupholder.

{¶ 47} Bowman was convicted of both charges.

## III. Assignments of Error

{¶ 48} Bowman assigns four errors for review.

I. The trial court erred to the prejudice of the appellant in denying the appellant's motion to suppress and motions in limine and allowing the appellee to present evidence against the appellant to the jury.

II. The Appellants conviction of Fairview Park Codified Ordinances 333.01(A)(1)(a) and 529.07(B)(4) was based upon insufficient evidence and was otherwise against the sufficient and/or manifest weight of the evidence and not beyond a reasonable doubt contrary to Ohio law and the state and federal constitutions.

III. The appellant was denied due process and fundamental fairness when the City of Fairview Park failed to produce probative, reliable, and exculpatory evidence, which was available and within its control, and which appellant had requested during the evidence state of proceedings.

IV. The cumulative and totality of the circumstances so severely prejudiced the prosecution of appellant as to require a new trial.

## IV. Discussion

### A. Denial of motions in limine and to suppress evidence

{¶ 49} A "motion to suppress" is a "[d]evice used to eliminate from the trial of a criminal case evidence which has been secured illegally, generally in violation" of constitutional rights. *State v. French*, 72 Ohio St.3d 446, 650 N.E.2d 887 (1995), citing *Black's Law Dictionary* 1014 (6th Ed.1990). An appellate court's review of a motion to suppress is subject to de novo review because it involves a mixed question of fact and law. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Under this bilateral standard of review, we give deference to the trial court's findings of fact if supported by competent, credible evidence. *State v. Preztak*, 181

Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 22 (8th Dist.). However, an appellate court independently determines whether the facts satisfy the applicable legal standard. *Id.*

{¶ 50} A motion in limine "is usually made before or after the beginning of a jury trial for a protective order against prejudicial [evidence], questions and statements * * * to avoid injection into trial of matters which are irrelevant, inadmissible and prejudicial." (Citation omitted.) *State v. Grubb*, 28 Ohio St.3d 199, 200, 503 N.E.2d 142 (1986). The standard of review for a motion in limine is whether the trial court abused its discretion regarding a request to limit or exclude evidence or testimony at trial. *Sokolovic v. Hamilton*, 195 Ohio App.3d 406, 2011-Ohio-4638, 960 N.E.2d 510, ¶ 13 (8th Dist.), citing *State v. Graham*, 58 Ohio St.2d 350, 390 N.E.2d 805 (1979); *State v. May*, 11th Dist. Ashtabula No. 2005-A-0011, 2006-Ohio-3406.

### 1. Lack of reasonable suspicion and probable cause

{¶ 51} Bowman first claims that the city lacked reasonable suspicion to stop and search/test him and lacked probable cause to arrest him. We disagree.

{¶ 52} Individuals are protected from unreasonable searches and seizures by the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A traffic stop constitutes a seizure within the meaning of the Fourth Amendment and must not be unreasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The Fourth

Amendment is not violated by an investigative stop where the officer has a reasonable suspicion that the individual is engaged in criminal activity. *State v. Jones*, 8th Dist. Cuyahoga No. 100300, 2014-Ohio-2763, ¶ 17. Reasonable suspicion requires that the officer "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶ 53} For an arrest to be constitutionally compliant, the arresting officer must have probable cause to believe the individual has committed a crime. *Id.* at ¶ 57, citing *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "In determining whether the police had probable cause to arrest appellant for OVI, we must determine whether, at the moment of arrest, the police had information sufficient to cause a prudent person to believe that the suspect was driving under the influence." *Id.*, citing *id.* at 91.

{¶ 54} "A probable cause determination is based on the 'totality' of facts and circumstances within a police officer's knowledge." *Id.*, citing *State v. Miller*, 117 Ohio App.3d 750, 761, 691 N.E.2d 703 (11th Dist.1997). "[T]he odor of alcohol, glassy eyes, slurred speech, and other indicia of alcohol use by a driver are, in and of themselves, insufficient to constitute probable cause to arrest." *Id.*, citing *Kirtland Hills v. Deir*, 11th Dist. Lake No. 2004-L-005, 2005 Ohio 1563, ¶ 16. However, "they are factors to be considered in determining the existence of probable cause." *Id.*, citing *id.*

## 2. Extraterritorial Stop

{¶ 55} The city advances that R.C. 2935.03(E)(3) authorizes the extraterritorial stop of Bowman's car. "A police officer * * * may arrest and detain, until a warrant can be obtained, any person found in violation of any section or chapter * * * of the Revised Code listed in Division (E)(1) of this section on the portion of any street or highway" "located immediately adjacent to the boundaries of the municipal corporation" where the officer is "appointed, elected, or employed." *Id.*

{¶ 56} Bowman replies that R.C. 2935.03 jurisdictional limits only apply where all of the following requirements are met:

(1) The pursuit takes place without unreasonable delay after the offense is committed;

(2) The pursuit is initiated within the * * * limits of the territorial jurisdiction of the peace officer;

(3) The offense involved is a felony, a misdemeanor of the first degree or a substantially equivalent municipal ordinance, a misdemeanor of the second degree or a substantially equivalent municipal ordinance, or any offense for which points are chargeable pursuant to section 4510.036 of the Revised Code.

R.C. 2935.03(D)(1)-(3).

{¶ 57} This court has held that the exclusionary rule is used to remedy violations of constitutional rights but not state statutes. *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 27, citing *State v. Fannin*, 8th Dist. Cuyahoga No. 79991, 2002-Ohio-6312, ¶ 9 ("The courts have held that a violation of

R.C. 2935.03(D) does not rise to the level of a constitutional violation, thus precluding the suppression of evidence for that reason.").

{¶ 58} The city also cites *State v. Weideman*, 94 Ohio St.3d 501, 764 N.E.2d 997 (2002), as justification for Officer Kelley's extraterritorial detention. *Weideman* held, "[W]here a law enforcement officer, acting outside the officer's statutorily territorial jurisdiction, stops and detains a motorist for an offense committed and observed outside the officer's jurisdiction, the seizure of the motorist by the officer is not unreasonable per se under the Fourth Amendment." *Id*. at 506. "The state's interest in protecting the public from a person who drives an automobile in a manner that endangers other drivers outweighs [the defendant's] right to drive unhindered." *Id.*

{¶ 59} A court considers the "totality of the circumstances in determining whether a violation of a statutory standard is unreasonable per se thus requiring suppression of evidence." *Id*. at 504. Thus, it is also possible that "a court could find that an extraterritorial stop is unreasonable based on the unique facts and circumstances of a particular case." (Fn. omitted.) *State v. Jones*, 121 Ohio St.3d 103, 2009-Ohio-316, 902 N.E.2d 464, ¶ 14.[5]

---

[5] "Our holding today does not modify well-settled law that reasonable suspicion is sufficient to justify an investigatory stop. *See U.S. v. Lopez,* 205 F.3d 1101, 1104 (9th Cir. 2000). We discuss probable cause only to highlight the fact that an extraterritorial stop for a traffic violation based on probable cause is reasonable. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Similarly, when the extraterritorial stop is based on reasonable suspicion rather than probable cause, *Weideman* still controls." *Jones,* 121 Ohio St.3d 103, 2009-Ohio-316, 902 N.E.2d 464, ¶ 19, fn. 4

{¶ 60} Bowman offers that the information initially received by North Olmsted's Officer Kelley and the Fairview Park officers was derived from Det. Beck's conversations with North Olmsted's dispatcher and from the on-the-scene conversations between Det. Beck, Officer Kelley, and Officer Thompson.

{¶ 61} Bowman also questions how Officer Kelley made those observations when Det. Beck testified he remained directly behind the Oldsmobile until he allowed Officer Kelley to pass to conduct the traffic stop. Officer Kelley also told the Fairview Park officer that Bowman's eyes were glassy, and he had trouble handing over his license though Bowman said it was due to seat-belt restrictions. Though Officer Kelley stopped Bowman based on the alleged traffic violations, Bowman was not cited for a traffic infraction.

{¶ 62} Bowman adds that despite timely discovery requests, records for the construction work demonstrated the restriping of the roads was done after the incident on July 3, 2021. North Olmsted dashcam footage was not produced nor video evidence of Bowman's interrogation or breathalyzer testing. Based on the totality of these unique circumstances, Bowman concludes that the stop and all that proceeded thereafter was illegal.

{¶ 63} The city counters that

1. Where an officer making an investigative stop relies solely upon a dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity.

2. A telephone tip can, by itself, create reasonable suspicion justifying an investigatory stop where the tip has sufficient indicia of reliability.

*Maumee v. Weisner*, 87 Ohio St.3d 295, 720 N.E.2d 507 (1999), paragraphs one and two of the syllabus.

{¶ 64} In *Weisner*, a motorist reported to police that he was following a suspected drunk driver and described what he observed. A police officer stopped the vehicle after verifying the description with the dispatcher. The driver was stopped, questioned, and arrested. *State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, 175 N.E.3d 527, ¶ 30, citing *Weisner* at 295.

{¶ 65} The *Tidwell* Court recounted its explanation in *Weisner* that there are three levels of informants:

> In that case, we said that when "the information possessed by the police before the stop stems solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip." [*Weisner*] at 299. "The appropriate analysis, then, is whether the tip itself has sufficient indicia of reliability to justify the investigative stop." *Id*. Acknowledging the three recognized categories of informants, we noted that an anonymous informant was comparatively unreliable and would consequently require independent police corroboration in order to demonstrate some indicia of reliability. *Id*. at 300. By contrast, we determined that an identified citizen informant may be highly reliable and, therefore, a strong showing as to other indicia of reliability may be unnecessary. *Id*.

*Id*. at ¶ 31.

{¶ 66} It was determined that the *Weisner* tipster possessed a greater indicia of reliability as an identified citizen informant than that of an anonymous informant. The court explained that categorizing the informant was just one factor in the totality of the circumstances. *Tidwell* at ¶ 32, citing *Weisner* at 302.

{¶ 67} The city suggests that Det. Beck and Officer Kelley are a step above the identified citizen informant on the reliability ladder as police officers trained to identify potentially impaired drivers. Coupled with the North Olmsted dispatch information monitored by Fairview Park, the officers' information is credible and reliable. "'Police officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Id.* at ¶ 20, quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

{¶ 68} This court finds that based on the totality of the circumstances North Olmsted police had a reasonable suspicion to conduct an extraterritorial stop of Bowman.

{¶ 69} Where a stop has been lawfully made, "a motorist may not be asked to perform field sobriety tests unless the request is separately justified by a reasonable suspicion based upon articulable facts that the motorist is intoxicated." *Westlake v. Goodman*, 8th Dist. Cuyahoga No. 111300, 2022-Ohio-3045, ¶ 19, citing *State v. Evans*, 127 Ohio App.3d 56, 62, 711 N.E.2d 761 (11th Dist.1998). "A court will analyze the reasonableness of the request based on the totality of the circumstances, viewed through the eyes of a reasonable and prudent police officer on the scene who must react to events as they unfold." *Parma Hts. v. Dedejczyk,* 8th Dist. Cuyahoga No. 97664, 2012-Ohio-3458, ¶ 30, citing *State v. Dye*, 11th Dist. Portage No. 2001-P-0140, 2002 Ohio 7158, ¶ 18.

{¶ 70} Fairview Park Officer Thompson received information from Det. Beck, Officer Kelley, and North Olmsted dispatch regarding Bowman's erratic driving. Officer Kelley informed Officer Thompson that Bowman had glassy eyes and difficulty handing over his license. Bowman did not advise the officer that he suffered from any physical limitations. Officer Thompson personally observed that Bowman looked like he was going to fall asleep, had glassy eyes, and exhibited slurred speech.

{¶ 71} Based on the foregoing, this court finds that Officer Thompson's decision to perform the standardized sobriety tests was reasonable based on the totality of the circumstances. Bowman was also unable to satisfactorily perform the vehicle pre-exit tests of reciting the alphabet without singing it and the HGN test that required Bowman to follow the tip of the officer's finger with his eyes.

### 3. Probable cause to arrest

{¶ 72} An arresting officer must have probable cause to believe the individual has committed a crime for an arrest to be constitutionally compliant. *Dedejczyk*, 8th Dist. Cuyahoga No. 97664, 2012-Ohio-3458, at ¶ 57, citing *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "In determining whether the police had probable cause to arrest appellant for OVI, we must determine whether, at the moment of arrest, the police had information sufficient to cause a prudent person to believe that the suspect was driving under the influence." *Id.*, citing *id.* at 91.

{¶ 73} "A probable cause determination is based on the 'totality' of facts and circumstances within a police officer's knowledge." *Id.*, citing *State v. Miller*, 117 Ohio App.3d 750, 761, 691 N.E.2d 703 (11th Dist.1997). "[T]he odor of alcohol, glassy eyes, slurred speech, and other indicia of alcohol use by a driver are, in and of themselves, insufficient to constitute probable cause to arrest." *Id.*, citing *Kirtland Hills v. Deir*, 11th Dist. Lake No. 2004-L-005, 2005-Ohio-1563, ¶ 16. However, "they are factors to be considered in determining the existence of probable cause." *Id.*, citing *id.*

{¶ 74} Based on the record, it appears that none of the police officers involved in this case had bodycams or dashcams except for Fairview Park Officer Barnie who was stopped just around the corner from the scene and arrived in less than one minute as Bowman was exiting the car.[6] This court's review of the video, coupled with the testimony of the officers, reflects that Bowman encountered difficulty with the National Highway Traffic Safety Administration tests.

{¶ 75} During the HGN test, the officers testified that Bowman, whose back was turned to the dashcam due to the street light shining in his face, was unable to follow Officer Thompson's finger with his eyes without moving his head. The officers said that Bowman was looking straight ahead though Bowman insisted he could see the officer's finger. The officers also stated that Bowman exhibited

---

[6] The audio was sometimes faint in portions of the video due to the proximity of the dashcam and the activities. The sound was also overwhelmed at times by dispatch communications.

considerable difficulty navigating the walk-and-turn test as well as the one-leg-stand field sobriety test.

{¶ 76} The cumulative evidence supports that there was sufficient probable cause to arrest Bowman for OVI.

### 4. R.C. 4513.17(D)

{¶ 77} Bowman argues here that the stop was invalid under R.C. 4513.17(D) and applicable law. Officer Kelley's cruiser had red and blue lights. Bowman states that the cruiser was required to have a "flashing red or a flashing combination red and white light, or an oscillating or rotating red light, or a combination red and white oscillating or rotating light" or "a flashing blue or a flashing combination blue and white light, or an oscillating or rotating blue light, or a combination blue and white oscillating or rotating light." R.C. 4513.17(D)(1)-(2).

{¶ 78} The statute also excepts from the stated light requirements "a person operating a public safety vehicle, as defined in Division (E)" and "a public law enforcement officer." *Id.* "The section's purpose is to reserve the combination of lights for those vehicles that concern public safety." *State v. Bowman*, 6th Dist. Erie No. E-19-016, 2020-Ohio-6974, ¶ 15.

{¶ 79} As the trial court explained, R.C. 4549.13 also provides that traffic officer vehicles "shall be marked in some distinctive manner or color and shall be equipped with but need not necessarily have in operation at all times, at least one flashing, oscillating, or rotating colored light mounted outside on top of the vehicle." R.C. 4549.13.

{¶ 80} The argument lacks merit.

### 5. NHTSA test noncompliance

{¶ 81} The city must demonstrate that the officer substantially complied with NHTSA. *Dedejczyk*, 8th Dist. Cuyahoga No. 97664, 2012-Ohio-3458, at ¶ 42, citing R.C. 4511.19(D)(4)(b); *State v. Clark*, 12th Dist. Brown No. CA2009-10-039, 2010-Ohio-4567, ¶ 11. Whether the facts support substantial compliance is decided on a case-by-case basis. *Id*, citing *State v. Fink*, 12th Dist. Warren Nos. CA2008-10-118 and CA2008-10-119, 2009-Ohio-3538, ¶ 26.

{¶ 82} Officer Thompson testified as to his qualifications, training, and field sobriety testing and provided detailed testimony regarding how each test was conducted and Bowman's performance. As addressed under the probable cause analysis herein, Officer Thompson administered the three tests. Based on this court's review of the record, including the testimony and video that visually and, for the most part, auditorily supported that the officer provided instructions to Bowman and demonstrations of the activity, this court finds that the officer substantially complied with NHTSA.

### 6. Breathalyzer

{¶ 83} Bowman agreed to take a breathalyzer test and volunteered to take it a second time after former Fairview Park Officer Callahan informed him he did fine at first, but the test was unsuccessful. The second test was also unsuccessful and Officers Callahan and Thompson marked the results as a refusal though the test reports indicated that the sample was deficient.

{¶ 84} Bowman argues the breathalyzer was not properly administered in violation of all applicable law, standards, and his constitutional rights and should have been excluded in limine. Bowman cites *Rocky River v. Brenner*, 2015-Ohio-103, 27 N.E.3d 31 (8th Dist.), and *Cleveland v. Evans*, 8th Dist. Cuyahoga No. 100721, 2014-Ohio-4567, where this court considered challenges to breathalyzer tests. Both cases involved the Intoxylizer 8000 apparatus, a device approved by the Ohio Department of Health ("ODH") and given presumptive validity. We also note that "absent a showing of prejudice by the defendant, substantial, not rigid, compliance with ODH regulations is sufficient." *Id.* at ¶ 40, citing *State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986). Bowman asserts that the city must demonstrate compliance with the regulations but does not specify the failures complained of — only that those failures resulted in the city's allegedly erroneous conclusion that a refusal took place. "An appellate court will not create an argument in support of an assignment of error where an appellant fails to develop one." (Citations omitted.) *Fontain v. Sandhu*, 1st Dist. Hamilton No. C-200011, 2021-Ohio-2750, ¶ 15, citing *State v. Franks*, 2017-Ohio-7045, 95 N.E.3d 773, ¶ 16 (9th Dist.). *See also* App.R. 16(A)(7).

### 7. **Bowman's statements**

{¶ 85} Here Bowman contends that the stop, approach, and testing did not fall within any exceptions that would allow the evidence discovered to be admissible, and that the incident was a "custodial interrogation and almost-immediate arrest" without a *Miranda* warning. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966). The city responds that the parties agreed that the video of Bowman after his arrest and during transport would not be played for the jury and it was not.

{¶ 86} *Miranda* warnings are required for custodial interrogations that could undermine an individual's "Fifth Amendment privilege against self-incrimination by possibly exposing a suspect to physical or psychological coercion." *State v. Waters*, 8th Dist. Cuyahoga No. 110821, 2022-Ohio-2667, ¶ 38, citing *Miranda* at 436. "'The ultimate inquiry is whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *State v. Duhamel*, 8th Dist. Cuyahoga No. 102346, 2015-Ohio-3145, ¶ 22, quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

{¶ 87} Bowman was sitting in his car when he was asked about alcohol consumption. "[R]oadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute 'custodial interrogation'" pursuant to *Miranda*. *State v. Ferrell*, 5th Dist. Delaware No. 20 CAA 10 0046, 2021-Ohio-2826, ¶ 45, citing *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).[7]

---

[7] In *Berkemer*, the United States Supreme Court ruled that the roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute custodial interrogation for the purposes of the *Miranda* rule. *See State v. Senedak*, 7th Dist. Mahoning No. 88 C.A. 160, 1989 Ohio App. LEXIS 2553 (June 21, 1989). The *Berkemer* Court noted that although an ordinary traffic stop curtails the freedom of action of the detained motorist and imposes some pressures on the detainee to answer questions, such pressures do not sufficiently impair the detainee's exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights. *Berkemer* at 421. The Court stated that "In short, the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominate' than that surrounding the kinds of interrogation at

{¶ 88} Also, "the nonverbal results of [a defendant's] breathalyzer and field sobriety tests are not self-incriminating statements." *State v. Miller*, 8th Dist. Cuyahoga No. 106946, 2018-Ohio-4898, ¶ 38, citing *State v. Henderson*, 51 Ohio St.3d 54, 57, 554 N.E.2d 104 (1990).

{¶ 89} Based on our determinations herein, we find that the trial court's denial of Bowman's motions in limine and to suppress were not in error. The first assignment of error is overruled.

## B. Sufficiency and manifest weight of the evidence

{¶ 90} Bowman asserts in his second assignment of error that his convictions were based upon insufficient evidence and were against the manifest weight of the evidence.

{¶ 91} "'A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law.'" *State v. Parker*, 8th Dist. Cuyahoga No. 110716, 2022-Ohio-1237, ¶ 7, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry in a sufficiency challenge is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime existed beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

---

issue in *Miranda* itself, ***." *Id.* at 438-439. "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at paragraph two of the syllabus. *State v. Ware*, 8th Dist. Cuyahoga No. 89945, 2008-Ohio-2038, ¶ 11, quoting *Fairview Park v. Hejnal*, 8th Dist. Cuyahoga No. 67506, 1995 Ohio App. LEXIS 116, at *4 (Jan. 19, 1995).

{¶ 92} When making a sufficiency determination, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at *id.* Under a sufficiency challenge, witness credibility is immaterial; the appellate court must defer to credibility determinations of the trier of fact and only review issues of law. *Parker* at ¶ 7.

{¶ 93} A manifest weight challenge and a sufficiency of the evidence challenge pose two distinct challenges to the evidence presented. *State v. Miree*, 8th Dist. Cuyahoga No. 110749, 2022-Ohio-3664, 199 N.E.3d 72, ¶ 30, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. A challenge to the manifest weight of the evidence "'involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins* at *id.* Weight of the evidence examines "'the evidence's effect of inducing belief.'" *Id.*, quoting *Wilson* at ¶ 25, citing *Thompkins* at 386-387.

{¶ 94} In reviewing a manifest-weight claim, the court must consider all the evidence in the record, the reasonable inferences drawn from it, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial order.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Finally,

the discretionary power to grant a new trial should be reserved for exceptional cases where "'the evidence weighs heavily against the conviction.'" *Id.*, quoting *id.*

{¶ 95} First-degree misdemeanor OVI Fairview Park Codified Ordinances 333.01(a)(1), provides:

No person shall operate any vehicle within this Municipality, if, at the time of the operation, any of the following apply:

A. The person is under the influence of alcohol, a drug of abuse, or a combination of them.

{¶ 96} Fairview Park Codified Ordinances 529.07(B)(4), open container prohibited, provides:

(b) No person shall have in the person's possession an opened container of beer or intoxicating liquor in any of the following circumstances

(4) Except as provided in subsection (d) or (e) hereof, while operating or being a passenger in or on a motor vehicle on any street, highway or other public or private property open to the public for purposes of vehicular travel or parking * * *.

{¶ 97} As detailed under the factual background and analysis of the first assignment of error, the jury heard testimony by the officers, viewed the video evidence, and heard Bowman's testimony. The police provided no video evidence of Bowman's alleged traffic violations that set the chain of events in motion or of what transpired when Officer Kelley made the stop or when Officer Thompson took over.

{¶ 98} The video evidence is from Officer Barnie's dashcam that began with his cruiser turning around in a driveway immediately around the corner from the stop as it took less than one minute for Officer Barnie to arrive. At that point, Officer

Thompson and Sergent Jurcek were already on site and Bowman was exiting his vehicle for the sobriety tests.

{¶ 99} The city's photographic evidence of the road where the alleged violations occurred did not reflect the construction and the date the photograph was taken is not in the record. The North Olmsted officers did not recall any construction on the road. There was no audio or video recording of the breathalyzer tests and the officer who conducted the tests was working for a different police department and did not testify.

{¶ 100} Bowman urged the jury to consider his age of 65, the events of the day, and that he was on the way to his mother's house with groceries, taking a route he took regularly as his 90-year-old mother's caretaker. He testified that he did not have his glasses, the truck headlights behind him impaired his vision, and the regular lane markings had not been repainted. Bowman also testified that the beers were consumed while he was working at his property during the day. One can was empty and the second contained what Bowman stated was tart cherry juice.

{¶ 101} Based on a thorough review of the record, this court cannot say that when viewed in a light most favorable to the prosecution, the evidence presented was insufficient to support the elements of the charges. In addition, the fact that the jury heard inconsistent testimony does not render the verdict against the manifest weight of the evidence. *State v. Rodriguez*, 8th Dist. Cuyahoga No. 109320, 2021-Ohio-2580, ¶ 29, citing *State v. Shutes*, 8th Dist. Cuyahoga No. 105694, 2018-Ohio-2188. The "'[t]he trier of fact may take note of any inconsistencies and resolve them,

accordingly, choosing to believe all, none, or some of a witness's testimony.'" *Id.*, quoting *State v. Shutes*, 8th Dist. Cuyahoga No. 105694, 2018-Ohio-2188, ¶ 49. The jury chose to believe the testimony of the police. This court cannot say that the jury clearly lost its way.

{¶ 102} The second assignment of error is overruled.

## C. Failure to produce exculpatory evidence

{¶ 103} Bowman's third claimed error is that his right to due process and fundamental fairness was violated by the city's failure to produce probative, reliable, and exculpatory evidence requested by Bowman that was available and within its control.

{¶ 104} "When the prosecution withholds material, exculpatory evidence in a criminal proceeding, it violates the due process rights of the defendant under the Fourteenth Amendment to a fair trial." *State v. Johnston*, 39 Ohio St.3d 48, 60, 529 N.E.2d 898 (1988), citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* violations may be found regardless of whether the defense requested the evidence and "irrespective of the good faith or bad faith of the prosecution." *Id.*, quoting *id.*

{¶ 105} Evidence is deemed material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *State v. McGuire*, 8th Dist. Cuyahoga No. 105732, 2018-Ohio-1390, ¶ 17, quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The defendant carries the burden to prove a *Brady*

violation rising to the level of a denial of due process. *Id.*, citing *State v. Iacona*, 93 Ohio St.3d 83, 92, 752 N.E.2d 937 (2001). "The requirements of *Brady* apply not only to exculpatory material, but also to evidence that impeaches the credibility of a prosecution witness." *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 73, citing *Bagley* at 676.

{¶ 106} There are three elements of a *Brady* violation: "(1) evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) evidence must have been willfully or inadvertently suppressed by the State; and (3) prejudice ensued." *State v. McGuire*, 8th Dist. Cuyahoga No. 105732, 2018-Ohio-1390, ¶ 18.

{¶ 107} Bowman argues that on July 9, 2021, a comprehensive demand for discovery was issued. On September 21, 2022, six days prior to trial, the city produced "a partial video tape of the stop, a dispatch tape, plus field sobriety tests, the arrest and transport of the defendant to the Fairview Park Police Station." Appellant's brief, p. 39. The items produced contained no evidence regarding the reason for the stop and of the breathalyzer tests. The police testified that only Officer Barnie was equipped with a dashcam.

{¶ 108} Bowman states he learned after trial that "all North Olmsted police some [sic] vehicles police cruisers are equipped with dashcam[s] and that photos and other footage of the area around Mastic Rd. and W. 220th St. were available or under the control of" the cities of North Olmsted and Fairview Park at and before the trial of the case. Appellant's brief, p. 39. Bowman also contends that Fairview

Park possessed records regarding the gas line installations in the form of a contract with Dominion Gas that demonstrated the streets were not striped until several days after the incident. A review of the record does not support that the failure to produce the cited evidence was presented to the trial court in, for example, the motion for a new trial. Thus, these issues are not before this court. "Appellate review is limited to the record." *State v. Davis*, 8th Dist. Cuyahoga No. 110301, 2021-Ohio-4015, ¶ 22, citing *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph two of the syllabus.

{¶ 109} During the motion in limine presented to the trial court prior to impaneling the jury, defense counsel argued that the two-part dashcam video tape partially depicting the detention, field tests, and Bowman's transport to the station was provided on September 21, 2022, only six days prior to trial. A continuance was not requested nor was a motion to compel the production of the allegedly missing evidence. The defense stated it did not allege that the omission was willful or negligent.

{¶ 110} The city responds that the delayed delivery of the video was not willful, as conceded by the defense, and was caused by a problem with Fairview Park's server. Defense counsel was initially informed there was no video. The city did not learn that video existed until defense counsel asked again eight days prior to trial. The parties agreed to exchange the video six days prior to trial when the parties were scheduled to meet in another court. The city argues there were no Crim.R. 16

discovery violations, the video was supplied prior to trial, and the material demonstrated Bowman was impaired so it was not exculpatory.

{¶ 111} This court does not find that Bowman has established the elements of a *Brady* violation. The third assignment of error is overruled.

### D. New trial

{¶ 112} Bowman's final argument is that the cumulative and totality of the circumstances severely prejudiced Bowman's prosecution of appellant as to require a new trial. The crux of the argument is that the delayed delivery of the videocams and dispatch audios prejudiced Bowman's defense.

{¶ 113} Our findings under the third assigned error demonstrate that the fourth assignment of error lacks merit.

## V. Conclusion

{¶ 114} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the Rocky River Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, ADMINISTRATIVE JUDGE

EILEEN T. GALLAGHER, J., and
MICHAEL JOHN RYAN, J., CONCUR